# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

## Commonwealth v. Frank Wilson, Appellant.

*Criminal law—Murder—Conspiracy—Evidence.*

On the trial of an indictment for murder where the commonwealth offered to show that the prisoner conspired with other persons to rob the deceased some months before the murder occurred, but the evidence in support of the offer shows only that the prisoner probably overheard a conversation among the other persons without assenting thereto or taking any part therein, the evidence should be rejected.

It is substantial error for a judge in charging a jury on the trial of an indictment for murder to give the commonwealth the full benefit of an offer of evidence, rather than the fair effect of what was actually proved under the offer.

*Criminal law—Murder — Confessions — Admissions — Evidence—Detectives.*

A confession voluntarily made is entitled ordinarily to great weight. If it is forced from the mind by the flattery of hope or the torture of fear induced by representations made to the accused, its value is lost, and it should be excluded altogether. If it is induced by what may be called collateral inducements it occupies a kind of intermediate position. Such inducements are to be considered as affecting, not the admissibility of the statements made by the prisoner against himself, but their credibility. They should go to the jury with the inducements that led to them, in order that the jury may see how they came to be made, and the motives that operated on the prisoner's mind when they were made. The jury can then judge of their value and determine the weight to which they are entitled.

On the trial of an indictment for murder it appeared that professional detectives, having fixed their suspicions on the prisoner, approached him and led him to believe that they were the members of a band of outlaws

engaged in the commission of great crimes, and that he could secure
admission to the band if his record as a criminal was such as to give
assurance of his courage and hardihood.   Under this inducement the pris-
oner made statements that he had been connected with various robberies,
and that he was one of the persons who had killed and robbed the deceased.
*Held*, (1) ·that while it was proper to admit in evidence the statements of
the prisoner as to the murder, it was error for the court in its charge to
fail to call to the jury's attention the collateral inducement which caused
the prisoner to make them; (2) that the statements in regard to crimes
other than that under investigation were not admissible in evidence.

*Practice, S. C.—Evidence—Exception—Assignment of error.*

The Supreme Court will not consider an assignment of error to the
admission of evidence where there is nothing on the record to show that
an exception was taken to the admission of the evidence.

*Evidence—Competency of child as witness.*

A boy thirteen years of age who alleges that he is fully aware of the
nature and importance of an oath is not incompetent because of his age.
If it is alleged that he is unacquainted with the nature of an oath, he
should be examined on that subject, and, if necessary, instructed in the
presence of the court.

*Practice, oyer and terminer—Trial—Calling witness out of order.*

Where the court on the trial of an indictment for murder consents that
'a witness for the defendant who could not be found in the court room
·should be called upon the following day, and with this understanding the
defendant rests his case, the court is bound to permit the witness to be
called upon the following day, if it appears that he is competent.   If the
'commonwealth or court ask the purport of the testimony before consent-
·ing that the witness may be called out of order, defendants must state it
fairly, but if it be not asked for, the calling of him is a return to the case
in chief of the defendant, and if his testimony would have been compe-
tent when he was first called and could not be found, it was competent
when called out of order.

Argued Jan. 25, 1898.   Appeal, No. 441, Jan. T., 1898, by
;defendant, from judgment of O. and T. Blair Co., Jan. T., 1896,
,No. 1, on verdict of guilty of murder.   Before STERRETT, C. J.,
··WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ.   Reversed.

Indictment for murder.   Before BELL, P. J.

The facts appear by the opinion of the Supreme Court and
by the charge of the court below which was as follows :

ᴵ   In the present instance, the case which you have been sworn
to try, the commonwealth claims that the death of Henry Bon

necke resulted from injuries upon him by some one in the perpetration of, or attempt to perpetrate, a robbery or burglary, and, if the defendant is guilty at all, he is guilty of murder in the first degree. I feel it my duty to say to you that the evidence does strongly indicate that Henry Bonnecke did die from the result of injuries received at the hands of a robber or robbers, or burglar or burglars, and that the person or persons, who killed him, were guilty of murder in the first degree, and, if the evidence satisfies you beyond a reasonable doubt, that defendant was the person or one of the persons who killed him, your verdict should be murder in the first degree. At the same time I instruct you that it is for the jury, and not for the court, in case they find defendant guilty, to ascertain and determine the grade of the offense, and, under the indictment in the present case, your verdict can be, in case you convict, guilty of murder in the first degree, guilty of murder in the second degree, or guilty of manslaughter. It is incumbent on the commonwealth in this case, as in every criminal case, to first make out the corpus delicti, the body of the offense, i. e., that the deceased was unlawfully and feloniously killed by some one. To show this, commonwealth produced evidence to prove that Henry Bonnecke, an aged German, for some time, probably over a year prior to April 7, 1895, resided in a small frame or plank house, on the north side of Sixteenth street, just west of Seventeenth avenue, in the city of Altoona. About 1 o'clock, in the afternoon of April 7, 1895, he was found lying dead on the floor of his house. His body, from below his knees up, was covered with an old hap, or old haps. He was gagged with a handkerchief bound tightly through his mouth and fastened around his neck back of and under his ears. Another cloth was bound over the top of his head, compressing and crowding to one side his nose. A wound, apparently inflicted by some instrument was found, some two or three inches long, on the left side of his head. Another injury was discovered on the back of his head, to which little attention seems to have been paid at that time, but which subsequent examination — when his body was exhumed on the request of detective Barring — disclosed to consist of a fracture of the skull. Dr. Weaver testifies that the gag in his mouth would be sufficient of itself

to produce death, and the wound on the back of the head, the fractured skull, unquestionably was a fatal one.

[From the testimony of the witnesses, among whom is J. N. Tillard, chief of police, of Altoona, as to the condition of the premises, the commonwealth claims to have shown conclusively that the dead man, Bonnecke, came to his death from wounds or injuries inflicted at the hands of a robber or robbers. If you are satisfied beyond a reasonable doubt that such claim of the commonwealth has been proved, then the corpus delicti, or body of the offense has been made out.

You will next inquire, was the defendant the robber or one of the robbers who inflicted the injuries which resulted in the death of Henry Bonnecke? The commonwealth alleges that it is shown from the testimony of physicians, Drs. Weaver, Closson and possibly Dr. Books, and from the testimony of Chief Tillard, coroner Poet, undertaker Hinkle and some other witnesses, that when the body was found at 1 o'clock on Sunday afternoon, April 7, 1895, the indications were that death had occurred within twelve hours prior to such finding of the body. Further reference will be made to the question of the time of the death when the defense upon the point is touched upon, but the theory of the commonwealth is that death occurred about or after, from 2 o'clock to 4 o'clock on the morning of Sunday, April 7, 1895, the day on which the body was found.] [19]

[To connect the defendant with the alleged killing, the commonwealth shows by Joseph Peddicord that some time prior to April 7, 1895, just at what time Peddicord is not certain, he was in company with William Doran, James Farrell and the defendant on the hill west of Altoona; that they had some conversation about Henry Bonnecke's supposed money, which he was miser-like hoarding, and as to the methods by which he could be robbed, but Peddicord says that Wilson took no part in the conversation although he was present.

Doran and Farrell are jointly indicted with Wilson, the present defendant, but are not now on trial, Doran not having been taken and Farrell now being in jail. It is further shown that on the evening of February 21, 1895, about dusk, Farrell and Peddicord did attempt to rob Bonnecke, but failed. Peddicord testified that on April 6 and 7, he was in West Virginia. The

commonwealth argues that Farrell and some other persons, one of whom was the defendant, again attempted to rob Bonnecke and did rob and kill him on the night of April 6 and 7, 1895.] [20]

[The commonwealth alleges that Wilson was released from the Blair county jail some time from 2 to 4 o'clock on April 6, left the house of Mrs. Lysinger, or Tillie Potter, about 5 o'clock on that afternoon, as shown by the testimony of Mrs. Lysinger, and was seen by Mrs. Noonan in the general neighborhood of the woods, where Farrell, Doran, Wilson and Peddicord are alleged to have talked about Bonnecke and his supposed hoarding money, between 5 and 6 o'clock of that day, in company with two men. It is further shown by the testimony of Mrs. Lysinger and Hattie Taylor, a cook or inmate of the Lysinger house, that Wilson retired to bed in a little front room of Mrs. Lysinger about 11 o'clock on that night, but that he got up again after 1 o'clock, went down the stairs quietly and went out of the house, as they supposed, and returned again to the house quietly and secretly about 4 o'clock in the morning. It is argued on behalf of the commonwealth that it was unnatural that a young, strong man like Wilson, on the first night after he had been released from a thirty days' term in jail, should go to his bed quietly and so comparatively early in a house of prostitution like Mrs. Lysinger's; that it would be but natural to suppose that he would spend his first night out of jail in drunkenness and debauchery, and that his going quietly to bed was but a part of a deep laid scheme to prove an alibi, and that he got up from bed and went to the house of Henry Bonnecke, which was on the same square as Mrs. Lysinger's house, at the corner of Seventeenth avenue and Fifteenth street, and Henry Bonnecke's house being on Sixteenth street, just off of Seventeenth avenue. Mrs. Lysinger further testifies that the handkerchief with which Henry Bonnecke was gagged resembled in its border and general appearance handkerchiefs belonging to Wilson, and Fanny Kelly, the laundress who did the washing for Wilson and the Lysinger or the Tillie Potter establishment, testified that, while Wilson was about the establishment, she washed a gentleman's handkerchief similar in general appearance to the handkerchief found around Bonnecke's mouth. As further proof of guilt the commonwealth points to the evidence

of Mrs. Lysinger as to alleged guilty action indicating guilt on the part of Wilson at breakfast on April 7, when, Mrs. Lysinger says, she related a dream and said that if any depredation had been committed on that night she could put her finger on the guilty party. Mrs. Lysinger further testifies to conduct alleged to indicate guilt on the part of Wilson after the body of Bonnecke was found, on Sunday afternoon, and on Monday, when he was reading an account of the murder in the newspaper, his hand trembled.] [21] It is further claimed as proof of guilt that when Wilson came out of jail on the afternoon of April 6, 1895, he had only ninety cents, being the proceeds of clothing sold to a fellow-prisoner, and that shortly after the death of Henry Bonnecke he was in funds, as shown by the testimony of Lloyd Lingafelter as to the roll of bills and silver shown by Wilson at the Brant House. Lingafelter is uncertain just how shortly after Bonnecke's death.

In October, 1895, Wilson was again in the Blair county jail on some trivial charge. A detective named Caron, employed by the detective agency of Barring & McSweeny, was placed in the jail apparently as a prisoner. Caron testifies that he ingratiated himself into the friendship of Wilson, who deemed him a fellow crook, and that after Wilson's release from jail they went to New York together for the ostensible purpose of joining a band of crooks and committing crime; that prior to leaving Altoona Wilson told Caron that there were crimes in Altoona hanging over his (Wilson's) head, and that in Philadelphia Wilson confessed to him that he (Wilson) had killed Henry Bonnecke. While Wilson and detective Caron were on their way to New York they were joined at Harrisburg by another detective, Jones, who was introduced by Caron to Wilson as the chief of a band of crooks. They went to the Putnam House, New York, and stayed at the same hotel from Wednesday, October 23, to Tuesday, October 29, 1895. Jones testifies that on several occasions while Wilson was thus in his company he (Wilson) confessed to the killing of Bonnecke. A third detective, Simpson, in the guise of a crook, joined the party while they were at the Putnam House, and he likewise testifies to confessions made to him by the defendant.

It is claimed that these alleged confessions could not have been boastings on the part of Wilson, and could not have been

fabricated on the part of the detectives, because Mr. Barring, chief of the detective agency, was led by the reports of h's operators, or one of them, to have the remains of Bonnecke exhumed, and it was then first discovered that the injury on the back of the head was of a serious and fatal character. It is further argued on the part of the commonwealth that Wilson's explanation that he was deceiving the detectives and working them to get their money and have a good time is improbable; that, while it is possible and conceivable that an individual who finds himself in the company of detectives might try to deceive and work them, it is very improbable that such individual would care to keep up the pretense of being guilty when he discovered the offense which they were trying to fasten upon him was murder, committed in the perpetration of a robbery; that it is improbable that Wilson would have tried longer to work the detectives when he found them, as he alleges, stealing his memorandum book, and starting out on a journey with burglars' tools for him to carry.

Counsel for the commonwealth argues that Wilson's whole story is an elaborate fabrication, with here and there a fragment of truth to hold it together and give to it plausibility, and that the very particularity of detail with which he professes to account for all his actions from April 6, 1895, until the time when he left Altoona to go to Rochester, and also while he was in the company of the detectives, is evidence that his story is a concocted one, which fact is further shown by his inability to give dates and particulars outside of the limit of time which he has mapped out for himself in making up his alleged concocted defense.

The commonwealth claims that Wilson's testimony about knowing all the time that Jones, Caron, Simpson and Barring were detectives is but a part of his concocted defense; that he may have had some idea at first that Caron was a detective, because a crook may be always on the watch for a detective in the garb of a fellow crook, but that any suspicion he at first had was wholly allayed and he thought he was in the company of criminals, and recited to them the murder of Henry Bonnecke, because he was in fact guilty of that crime and that the facts in evidence taken as a whole are reconcilable on no other theory than that which imputes guilt to the defendant, consequently

that he should be convicted. The fact that he, by his own confession, led a dissolute and, in some instances, a criminal life is pointed out as tending to induce the idea that his story should be received with caution and it is urged that he is wholly unworthy of belief.

On the other hand, it is most strenuously contended on behalf of the defendant that he is not guilty, or, at least, that his guilt is not proved beyond a reasonable doubt. [In the first place, the defense join issue with the commonwealth as to the time of the commission of the alleged offense, or rather as to the time of the death of Henry Bonnecke. How is this, gentlemen? It is a question of fact for you. Wilson did not get out of Blair county jail until the afternoon of April 6, 1895. If you have a reasonable doubt as to whether or not the injuries to Bonnecke were inflicted prior to the time of Wilson's release from jail, the defendant is entitled to the benefit of such doubt and acquittal. On the one hand you have the testimony of Dr. Weaver and others that in their judgment, regard being given to the absence of rigor mortis, or the stiffness of death, the freshness of the blood, the appearance of the body and other circumstances, death had occurred at a period not more remote from the finding of the body than twelve to fifteen hours. You have likewise the testimony of Denton Ditch as to the noise heard by him about 3 o'clock on Sunday morning, April 7. You have further the alleged fact that Henry Bonnecke was a recluse, a man who for days at a time was seen by no one, and seemingly remained much of his time in his house, admitting callers with reluctance, and only when he thought they were friends, a man whose nonappearance would occasion little, if any, comment or inquiry in the neighborhood; further, the testimony of Drs. Closson and Book, as to their judgment as to the probability of death resulting instantaneously, or at least in a very brief space of time from the fracture of the back part of the skull at the base of the brain, and the testimony of Dr. Weaver that the handkerchief in the mouth was sufficient to kill Henry Bonnecke; further, the theory of the commonwealth, predicated on the finding of matches scattered about, that the attack of Bonnecke occurred in the nighttime, and their argument that the defendant, Wilson, was acquainted with the deceased, and may have obtained admission to the house by

reason of such acquaintanceship. On the other hand, for the defense, you have the testimony of Dr. Alexander and other doctors and statements in medical text-books that rigor mortis may be delayed for twenty-four or even thirty-six hours after death; the further testimony as to the effect of the warmth which might be produced by the covering of haps in retarding rigor mortis ; the fact that persons whose skulls are badly fractured do sometimes live on for a considerable time, and the contention on the part of the defendant's counsel that Henry Bonnecke may have been injured on Friday, or even Thursday night, and lingered alive for a considerable time ; the evidence of Mrs. McCarthy as to her going to the Bonnecke house on Saturday, April 6, with provisions, and knocking, but no answer, and as to Mr. George Keisel likewise fruitlessly knocking at her instance ; also the testimony of the young man, Kelly, that he, like Mrs. McCarthy, twice on the same Saturday unsuccessfully tried to gain admittance by knocking at the door and heard no sound within the house ; the theory of defendant's counsel that the attack was committed at a time when Bonnecke was preparing a meal, presumably in the daytime or early evening, founded on the finding of the coffee pot and the pot with burnt potatoes on the stove, showing it is claimed, that the attack was made a considerable time, more than twelve or fifteen hours, prior to the finding of the body.] [19]

I have alluded to but part of the evidence on the one side and the other as to the time of the death. You will consider all the testimony on this point and conscientiously endeavor to give to each particle of it the weight to which, in your judgment it may be entitled.

It is claimed on the part of the defendant that the only evidence of conspiracy, or confederacy, on the part of Wilson, Doran and Farrell is the testimony of Peddicord, an accomplice in the alleged confederacy and a confessed criminal, whose testimony should have no weight. Again defendant testifies, that he did not leave the Lysinger house at or about 5 o'clock but remained there until 7 o'clock ; hence Mrs. Noonan is mistaken or falsifying when she locates him out towards the woods between 5 and 6 o'clock; that the reason that he went to bed early on Saturday night was because, while in jail he had acquired the habit of retiring early, and that when he came out of

jail his intention was to lead a new life, but he succumbed to temptations and drifted back to his old habits. True it is, so testifies defendant, that he got up out of bed and went down stairs after 1 o'clock on Sunday morning April 7, 1895, but this was occasioned, not by a pre-concocted plan to rob Bonnecke but by reason of his having to go to the water closet, which was in the rear of the lot.

He denies the alleged action indicative of guilt testified to by Mrs. Lysinger, and it is contended for him that Mrs. Lysinger is a keeper of a house of prostitution, a woman whose testimony we should scrutinize with care and accept with caution, and that she has a propensity for posing as a detective, which pro-. pensity tends to warp her judgment and memory, and causes her to attach a guilty inference to actions which are in fact innocent.

Defendant further explains that he got the money which Lloyd Lingafelter saw him have in the Brant House while he was acting as temporary manager of a house—the testimony would indicate that it was of the same character as the Lysinger or Tillie Potter house—of one, Sadie Smead. He denied that the handkerchief with which Henry Bonnecke was gagged was his, and it is argued on his behalf that similar handkerchiefs can be bought at many stores and are in use by many persons.

The defendant further testifies that he knew Caron was a detective, and it is claimed that in this he is corroborated by Walker and Stehley, fellow inmates of the jail; that he went with Caron to have a good time, and that it was at the instance of Caron he gave evasive answers to the questions of Jones and Simpson and the other two detectives, and that all the time he knew Jones, Simpson, Caron and Barring were detectives.

In determining whether you will believe the evidence of Wilson, the defendant, or of the detectives, you will consider their manner on the stand, the inherent probability or improbability of their testimony, and their respective motives for falsifying. The defendant, Wilson, has a strong motive, which might lead him to falsify, to wit: the fear of punishment if convicted. [So far as it is disclosed by the evidence in this case the detectives have no pecuniary interest to be untruthful, as their pay does not depend on the conviction of the defendant. You will con-

sider, however, as affecting their credibility, the likelihood of a desire to achieve professional reputation, causing them to swerve from the truth, and the probability of a disposition to suspect guilt impairing their recollections of conversations and their description of actions or occurrences. But, apart from what has just been said as to a possibility of the evidence of the detectives being warped or biased by a desire to attain professional reputation and a predilection to suspect guilt, the evidence of the detectives is to be received and considered and weighed just as the evidence of any other witness. Speaking for myself, I would say that I have no sympathy in the idea advanced by counsel for defense, that there is no difference between a detective and a crook. The very duty of a detective is to detect crime, and in so doing it is justifiable to resort to methods which would not be justifiable in the ordinary transactions of life, just on the same principle as it is perfectly allowable for a farmer to bait a trap with cheese to catch a rat or to keep a cat about the premises to catch mice. Honest men have nothing to fear from detectives, and crooks are often only to be entrapped by the use of the wiles of a detective in the guise of a crook. When depredations are committed by unknown criminals the community is loud in its calls upon the proper authorities to adopt vigorous methods to apprehend the criminals. One of the measures which it is justifiable to adopt and often the only effective measure which can be adopted is to resort to a detective agency. An honest district attorney will endeavor to secure honest detectives, and, as I take it, honesty and truthfulness in testifying are as essential to true and lasting success in detective work as in any other pursuit in life ; and I have no sympathy with the prejudice which unreasonably prevails in some minds against all detectives. There are honest detectives and truthful testifying detectives, just as there are reputable, honest lawyers, and the evidence of detectives is to be viewed in the same light, is to be tried by the same tests, and is to be as dispassionately considered as is the testimony of any other witness.

What I have just said is not intended to in the least prejudice the defendant, and I caution you not to allow it to prejudice the defendant. But it has been said to disabuse your

minds of any prejudice which you might have against detectives as a class. The able and zealous counsel for defendant contends, however, that, even assuming the testimony of defendant in denying the alleged confession to the detectives to be false, and admitting that he did tell the detectives that he, Farrell and Doran did kill Henry Bonnecke, yet still it by no means conclusively follows that he is guilty, because it may be that, in telling about his share in a crime, he wished to establish his standing as a crook.] [22] Men do sometimes boastingly lie about their exploits and actions; fishermen sometimes regale one another with fictitious accounts of the number and size of their respective catches of fish, and it may be that crooks sometimes endeavor to enhance their standing among their fellow crooks by imputing to themselves crimes they never, in point of fact, committed. You will consider the arguments of defendant's counsel on this point, that Wilson lyingly may have pretended that he killed Bonnecke, and give to it the weight to which, in your judgment, it may be entitled.

In order to show that, either the detectives were falsifying in their allegations that Wilson said to them that he, Doran and Farrell had killed Henry Bonnecke, or that Wilson was boastingly lying if he did make such a statement, the defense offered evidence to prove that Farrell could not have been in Altoona on the night of April 6 and 7, 1895, because on that night he was over one hundred and fifty miles away, in Alliquippa and Beaver. James Donnelly, a brother-in-law of James Farrell, testifies that, on April 6, he remembered the day on account of the funeral of Mrs. Russell the day previous, Farrell was at his (Donnelly's) house, in Alliquippa, and in the evening they went to Beaver together; that he (Donnelly) returned to Alliquippa about 9 o'clock in the evening, leaving Farrell in Beaver, and that Farrell returned to Alliquippa early on the morning of April 7, 1895, the morning of the day when Bonnecke's body was found. If Donnelly's evidence is true it would be impossible that Farrell should have had any active hand in the killing of Bonnecke, because it would be out of the question, regard being had to the schedule or running time of the railroad trains, for Farrell to have left Beaver, Pa., after 8 o'clock Saturday evening, and gotten to Altoona before daylight Sunday morning, much less to have gone to Altoona and returned back to Alli-

quippa by Sunday morning. But, as a reply to Donnelly's testimony, the commonwealth alleges that Farrell was not in Alliquippa on Saturday afternoon, April 6, 1895, but, at or about noon of that day—Pittsburg time and Altoona time—he left Alliquippa for Pittsburg and did not return to Alliquippa until the afternoon of Monday, April 8, 1895. To prove this they called Josephine Rink, who testifies she worked as a hired girl for the Donnelly family, where Farrell boarded, in April, 1895, and that Farrell on April 6, started for the 12:20 P. M. train—Pittsburg and Altoona time—11:20 A. M., central time, on the Pittsburg & Lake Erie Railroad. That train, according to schedule time, arrives in Pittsburg at 1:15, Altoona time. If Farrell did go to Pittsburg on the said mentioned train he could easily have gotten to Altoona on Philadelphia express at 8:50 P. M. on Saturday evening, April 6, 1895. From the testimony of the railroad conductors, it is likewise shown to have been possible for a person in Alliquippa at noon on April 6, 1895, by other trains to have reached Pittsburg in time to take the Pittsburg division, Pennsylvania Railroad, trains to Altoona so as to reach the last-mentioned city by midnight on Saturday, April 6. Further, to contradict Donnelly in his testimony that Farrell did not leave Alliquippa from the time he arrived there, about the last of February, 1895, until Decoration day, except to go to Beaver, the commonwealth called George Kelly, who testifies that he is now a member of the Altoona police force, but was not on April 6, 1895; that one evening, as near as he can remember it was April 6, 1895, but he is not positive, he saw Farrell and Doran in company with Cassidy, and probably some others he did not know, on Sixteenth street, in Altoona. Martin Heist, a clerk at a store on Fifth avenue and Twentieth street, testifies he saw Farrell go into his (Farrell's) wife's house, on Twentieth street, or that neighborhood, in the forepart of April, 1895, after his (Heist's) birthday, which was April 5, 1895. The commonwealth called other witnesses who testified they saw a man they took to be Farrell in Altoona in April, 1895. This question of the presence of Farrell in Altoona on April 6, or the night of that day, is only an incidental question in the present case. We are trying Wilson, not Farrell, and you should be cautious not to attach undue importance to either the presence or absence of Farrell on the night of the

murder. Farrell might have been in Altoona on that night and still the defendant may be innocent. On the other hand, Farrell might not have been in Altoona that night and the defendant might still be guilty, as his companion in crime, if he had any companion in the crime, might have been others than Farrell. This testimony as to the probable presence of Farrell in Altoona was introduced into the case as tending to throw some light on the question as to whether the detectives were falsifying when they testified to alleged confessions of Wilson as to himself, Farrell and Doran having committed the crime, or whether assuming that Wilson did so tell the detectives, Wilson was boastingly lying in such story. In this connection, I might say that it is claimed on the part of the commonwealth that when put to work on Wilson the detectives were not informed of the details of the crime, and the then absence of such knowledge of details on their part, in view of the alleged fact that the confession of Wilson as recounted by them agrees with the facts surrounding the murder in relation to the injury of the back of the skull, the gagging with the handkerchief, etc., is conclusive proof not only that they, the detectives, are telling the truth, but that Wilson was not boastingly pretending to have committed a murder, but was relating to them a story of a crime in which he was in point of fact an actual participant.

I have endeavored to briefly refer to what strikes me as the most salient points in this case. I have not attempted to allude, much less recount, the evidence or all the respective arguments of counsel. The respective counsel have most ably and exhaustively argued the case, and when you go to your jury room you will conscientiously and carefully endeavor to recall to your minds all the testimony, and to give to each particle of it the weight to which it may be entitled.

The burden is on the commonwealth to make out every essential ingredient of the offense beyond a reasonable doubt, and before you will be warranted in bringing in a verdict of guilty, your minds should come to the firm, unwavering conviction that the defendant is guilty. If you have a reasonable doubt as to his guilt, such reasonable doubt should operate to acquit the defendant, but this doubt should be a reasonable doubt—not a pretended or fancied one. It should be such a doubt as would cause you to stop and hesitate before taking action in the ordinary business affairs of life.

Defendant's ninth point and the answer thereto are as follows:

9. The confessions and admissions relied on by the commonwealth to secure the defendant's conviction are testified to solely by detectives and their employers, who are interested parties. It is unsatisfactory evidence and should be cautiously received, and must be carefully scrutinized and examined by the jury before giving such credit as would authorize a verdict of "guilty."

*Answer:* I refuse this point as it is put. I decline to instruct you that the evidence of detectives is a "most unsatisfactory" evidence. [18]

Verdict of guilty of murder of the first degree, and sentence imposed.

*Errors assigned* were (1) in admitting the testimony of Joseph Peddicord as to the attempted robbery of Henry Bonnecke by James Farrell and Joseph Peddicord, on February 21, 1895, when the defendant was not present, and with which he had no connection; (2) in permitting Joseph Peddicord to testify as to declarations of James Farrell at the time of the attempted robbery of Henry Bonnecke, on February 21, 1895, when the defendant was not present, and with which he had no connection; (3) in not striking out the testimony of Joseph Peddicord, after he had testified that there was no conspiracy to rob Henry Bonnecke; (4) in permitting James Behe to testify as to the assault upon Henry Bonnecke, on February 21, 1895, by Joseph Peddicord and James Farrell, when defendant was not present, and with which he had no connection whatever; (5) in permitting Henry J. Plumer to testify as to the assault upon Henry Bonnecke by James Farrell and Joseph Peddicord, on February 21, 1895, when defendant was absent, and with which he had no connection whatever; (6) in permitting Charles Burns to testify to the assault upon Henry Bonnecke by James Farrell and Joseph Peddicord, on February 21, 1895, when the defendant was absent, and with which he had no connection whatever; (7) in permitting Theodore N. Jones to testify as to alleged confessions elicited by threats and promises of reward, and made while he was under duress and imprisonment in the detectives' office in Scranton, Pa.; (8) in refusing to strike out the testimony of Theodore N. Jones, where he testified to an alleged confession of the defendant, "that he, the de-

fendant, assaulted an old man in Ohio by the name of Toby Jackson; " (9) in refusing to strike out the testimony of Theodore N. Jones, where he testified to an alleged confession of the defendant, that he, the defendant, planned to rob the National Bank of Hollidaysburg; (10) in permitting James Keighron to testify as to an alleged confession of the defendant that " he, the defendant, Doran and McCabe, stole $50,000 worth of bonds and got rid of them in New York City; . . . . that the defendant planned to rob the Hollidaysburg National Bank, . . . . that the defendant robbed a business man in Altoona by the name of Washington Skinney; . . . . that the defendant suggested to the witness to rob Tillie Lysinger (Tillie Potter); " (11) in overruling defendant's offer to prove the contract between the county commissioners of Blair county and the detective agency; (12) in refusing to permit Samuel Smith to testify in relation to time of the death of deceased; (13) in refusing to permit Mrs. Anna Smith to testify in relation to time of death of deceased; (14) in permitting P. A. Schwab to testify that the defendant attempted to rob him on April 27, 1895; (15) in permitting Mayor Hoyer to testify concerning the attempted robbery of P. A. Schwab, on April 27, 1895; (16) in permitting Tim Donoghue to testify concerning the attempted robbery of P. A. Schwab, on April 27, 1895; (17) in permitting L. N. Detrich to testify concerning the attempted robbery of P. A. Schwab, on April 27, 1895; (18–22) above instructions, quoting them.

*R. A. Henderson,* for appellant.—There was no agreement in which the prisoner participated which amounted to a conspiracy; Rapalje & Lawrence's Law Dictionary, 271; Ormsby v. People, 53 N. Y. 472; Place v. Minster, 65 N. Y. 105; 3 Rice on Criminal Evidence, 904.

It is necessary that defendant's guilt, either as a principal or accessory, should be finally established by evidence of his own acts: Wright & Carson's Crim. Conspiracies, 69; People v. Thomos, 3 Park, Crim. Rep. 256; People v. Courtney, 28 Hun, 589; Cuyler v. McCartney, 40 N. Y. 221; 43 Leg. Intelligencer, 57; Johnson v. Miller, 63 Iowa, 529; U. S. v. Jones, 3 Washington C. C. 209; Swan v. Com., 104 Pa. 218; Stephen's Dig. Crim. Law, art. 39; Reg. v. Barry, 4 Fost. & F. 389;

State v. Cox, 29 Mo. 475; Clem v. State, 33 Ind. 418; Connaughty v. State, 1 Wis. 159; 60 Am. Dec. 370.

In any case where illegal testimony has been admitted, or legal testimony rejected, a new trial may be had, if objection was only taken at the trial: Com. v. Green, 17 Mass. 515; Com. v. Edgerly, 10 Allen, 184; Carter v. People, 2 Hill (N. Y.), 317; People v. Restell, 3 Hill (N. Y.), 289; People v. Spooner, 1 Denio, 343; People v. McGee, 1 Denio, 21; Stokes v. People, 53 N. Y. 164; Com. v. Parr, 5 W. & S. 345.

In the following cases statements made by the prisoner were held inadmissible, because being induced by the language set out in each case: Rex v. Griffin, Russ. & Ry. 151; Rex v. Kingston, 4 Car. & P. 387; Rex v. Enoch & Pulley, 5 Car. & P. 539; Rex v. Mills, 6 Car. & P. 146: Rex v. Simpson, 1 Moody, 410; Rex v. Upchurch, 1 Moody, 465; Reg. v. Croydon, 2 Cox C. C. 67; Reg. v. Garner, 1 Den. C. C. 329.

No evidence can be admitted which does not tend to prove or disprove the issue joined. In criminal proceedings the necessity is stronger, if possible, than in civil cases, of strictly enforcing the rule that the evidence is to be confined to the point in issue; for where the prisoner is charged with an offense it is of the utmost importance to him that the facts laid before the jury should consist exclusively of the transaction which forms the subject of the indictment, which alone he can be expected to come prepared to answer: 3 Rice on Crim. Evidence, sec. 39; People v. Stout, 4 Park, Crim. Reps. 71; Roscoe, Crim. Ev. 81; Fox v. Clifton, 6 Bing. 354; Hudson v. State, 3 Cold. 355; Wiley v. State, 3 Cold. 362; Lightfoot v. People, 16 Mich. 507; Goersen v. Com., 99 Pa. 388; Com. v. Ferrigan, 44 Pa. 386; Kramer v. Com., 87 Pa. 299; Com. v. Johnson, 133 Pa. 293; Whart. on Crim. Plead. & Prac. sec. 801.

When a witness gives material evidence it is always important to ascertain and discover how much weight or reliance can be placed upon his testimony. Whatever may weaken or tend to discredit his evidence is important and material, and necessarily affects the determination of the issue: Shepard v. Parker, 36 N. Y. 517; 3 Rice on Criminal Evidence, 364.

*William S. Hammond,* for appellee.—It makes no difference at what time any one entered into the conspiracy. Every one

who does enter into an act proposed or designed is generally deemed, in law, a party to every act which had already been done by the others, and a party to every act which may afterwards be done by them in the furtherance of such act designed: 1 Greenleaf on Evidence, sec. 111; 3 Rice on Evidence, sec. 581; Spies v. The People, 122 Ill. 1; United States v. Dorsey, 3 Star Route Trials (Gov't ed.), 3188.

After the existence of the conspiracy is established, and the particular defendants have been proved to have been parties to it, the acts of other conspirators may, in all cases, be given in evidence against them, if done in furtherance of the common object of the conspiracy: Phil. Ev. (10th ed.) 157; Hardy's Case, 24 Howell's State Trials, 475; 1 Roscoe's Evidence (8th ed.), p. 575; 1 Bishop's Criminal Procedure, sec. 1248; 2 Bishop's Criminal Procedure, sec. 227; Campbell v. Com., 84 Pa. 196; Com. v. Crossmier, 156 Pa. 310; Com. v. Salyards, 158 Pa. 507.

To exclude a confession of guilt, some inducement must be held out to prompt to falsehood, or some threat made exciting fear in the mind of the defendant, thus promoting to falsehood. Of this the trial court must be the judge in the first instance, and its ruling will not be set aside, except for manifest error: Fife v. Com., 29 Pa. 429; Com. v. Johnson, 162 Pa. 71.

It is in the discretion of the court to admit or overrule evidence offered in rebuttal, which might have been given in chief: Gaines v. Com., 50 Pa. 319.

This Court will not review the judgment of the court below upon matters within its discretion except for manifest and gross abuse of its discretion: Cathcart v. Com., 37 Pa. 111; Howser v. Com., 51 Pa. 341; McManus v. Com., 91 Pa. 67.

OPINION BY MR. JUSTICE WILLIAMS, May 9, 1898:

The defendant, Frank Wilson, was indicted jointly with James Farrell and William Doran for the murder of Henry Bonnecke. He was separately tried, and convicted of murder of the first degree. A new trial was then applied for, which the court below refused, and the defendant has removed the record of his trial and conviction into this Court by appeal. Twenty-four errors are assigned to the rulings of the learned judge upon the trial, but the questions raised by them are re-

ducible to six. The first of these is raised by the assignments which relate to the admission of the testimony of Joseph Peddicord, the subsequent refusal to strike it out, or withdraw it from the jury, and the treatment of this testimony by the learned judge in his charge to the jury.

When Peddicord was called to the witness stand the defendant's counsel asked for an offer showing what it was proposed to prove by him. An offer was then submitted as follows: " The prosecution proposes to prove by the witness that Frank Wilson, the defendant on trial, and James Farrell and William Doran, who are jointly indicted, and Joseph Peddicord, the witness, did in 1894 and at divers times prior to the time of the murder of Henry Bonnecke, plan, conspire and agree together and among themselves, to rob Henry Bonnecke; and in pursuance of said conspiracy James Farrell and Joseph Peddicord made an assault with intent to rob the said Henry Bonnecke on February 21, 1895, and that immediately after this attempt James Farrell declared he would have the old man's money if he had to kill him." So much of this offer as related to the conspiracy by the defendant with others to rob Bonnecke, and to what had been done in pursuance of this conspiracy by two of the conspirators was, we think, competent upon its face. The theory of the commonwealth was that the murder had been committed for the purpose of enabling the murderers to rob the old man without outcry or resistance on his part, and the fact that the defendant was one of four conspirators who had agreed upon a plan to rob him but a few months before the robbery and murder occurred was certainly a relevant and an important circumstance for the prosecution. But when the evidence under this offer was all in it did not sustain the offer. The witness testified that Wilson was present when the other persons named in the offer talked over the subject of Bonnecke's having money and how it could be gotten; but that he took no part in the conversation. No part of it was addressed to him, and no response or assent of any sort was made by him. This did not show a conspiracy to which he was a party. Two of the actual conspirators did afterwards make an ineffectual attempt to rob Bonnecke, but Wilson was not with them nor does it appear that he knew the attempt was to be made. The only spark of evidence to connect Wilson with the conspiracy or the attempted

robbery is the fact that he probably overheard some part of the conversation between Peddicord, Farrell and Doran relating to Bonnecke and his money. If the offer had proposed just what the testimony admitted under it established, viz: that Wilson had overheard a conversation between some of his acquaintances showing their purpose to rob Bonnecke if they could, we have no doubt that it would have been promptly rejected.

When the effort to prove a conspiracy to which Wilson was a party failed, the proof of what was alleged to have been done under the conspiracy and in pursuance of it became incompe-. tent. The only thing to connect the defendant with the attempt of Peddicord and Farrell to rob Bonnecke was the alleged conspiracy, and this failing there was no more reason why the defendant should be affected by their crime than by the crimes of any other persons. For this reason we think the evidence, having failed to sustain the offer, should have been withdrawn as the defendant's counsel asked. But that of which the defendant has a right to complain more seriously is the use made of the testimony of Peddicord by the learned judge in his charge. He said: " To connect the defendant with the killing, the commonwealth shows by Joseph Peddicord that some time prior to April, 1895, . . . . he was in company with William Doran, James Farrell and the defendant on the hill west of Altoona; that they had some conversation about Bonnecke's supposed money which he was miser-like hoarding, and as to the methods by which he could be robbed, but Peddicord says that Wilson took no part in the conversation although he was present." The learned judge then added: " Doran and Farrell are jointly indicted with Wilson, the present defendant, but are not on trial, Doran not having been taken and Farrell being now in jail. It is further shown that on the evening of February 21, 1895, about dusk, Farrell and Peddicord did attempt to rob Bonnecke but failed . . . . The commonwealth argues that Farrell and some other persons, one of whom was the defendant, again attempted to rob Bonnecke, and did rob and kill him on the night of April 6 and 7, 1895." This gave the commonwealth the full benefit of the offer, rather than the fair effect of what was actually proved under it, and is we think a substantial ground for complaint.

The next question is raised by the assignments, numbers

seven to ten inclusive, and relates to the admissibility of the so-called confessions made to, and shown by, the professional detectives who were employed to ferret out the murderers of Bonnecke by the officers of Blair county. Soon after the coroner's inquest was held upon the body of the murdered man the county commissioners of that county employed a detective agency to work upon the case, and to find out if possible who were the murderers and bring them to trial for their crime. This was a proper thing to do. The detectives entered upon their work at once. Suspicion was directed toward Wilson among others, but there were no such incriminating circumstances known as would justify his arrest and trial. A plan, somewhat elaborate and skilful in outline, was adopted to obtain such declarations from him as would make his trial and conviction possible. It was put into execution with vigor and without any regard to truth or the unconscionable means required. The defendant was led to believe that the detectives about him were the members of a band of outlaws engaged in the commission of great crimes, including the burglary of banks and the plunder of railroad trains, from which large sums of money were realized by them; and that he could secure admission if his record as a criminal was such as to give assurance of his courage and hardihood. He became an applicant for admission to this band, and the so-called confessions are the statements made by him to the persons whom he understood to be prominent in the organization, and in a position to obtain his admission as a member. He alleged that he had been connected with robberies, burglaries and larcenies in Pennsylvania and Ohio, and that he was one of the persons who had killed and robbed Bonnecke. Now we are of opinion that so much of these stories of his own crimes as related to the killing of Bonnecke was admissible, not as a confession in the ordinary sense of that word, but as a statement made by him relating to that subject, the value of which was for the jury to determine. It was made for a definite purpose which he was anxious to accomplish, viz: to satisfy the supposed criminals by whom he was surrounded that he was capable of crimes as great, and possessed of a record as black, as they, and that he could be trusted implicitly to keep their counsels and to assist in their law-breaking schemes. There was a temptation in the circum-

stances under which he was acting to represent himself to be, if possible, worse than he really was.   His attention was on an ulterior object.   Confession for the purposes of confession was the farthest possible from his thought.   Still, what he said was admissible in evidence against him.   It should go to the jury however for no more than it is worth.   A confession voluntarily made is entitled ordinarily to great weight.   If it is, in the language of Mr. Greenleaf, " forced from the mind by the flattery of hope or the torture of fear," induced by representation made to the accused, its value is lost.   It should be excluded altogether.   If it is induced by what may be called collateral inducements it occupies a kind of intermediate position.   Such inducements are to be considered as affecting, not the admissibility of the statements made by the prisoner against himself, but their credibility.   They should go to the jury with the inducements that led to them, in order that the jury may see how they came to be made, and the motive that operated on the prisoner's mind when they were made.   The jury can then judge of their value and determine the weight to which they are entitled.

The learned trial judge seems to have followed in part the rule we have indicated and to have sent all the circumstances and inducements leading to the so-called confessions to the jury. The only just ground of complaint is that the attention of the jury was not called distinctly to this subject in the general charge, and the situation and value of statements like those testified to by the detectives pointed out.   This duty of the judge under such circumstances is commented on in The State v. Wentworth, 37 N. H. 218, where the collateral inducement was the desire to obtain a reward that had been offered; in a Virginia case, 14 Gratt. 652, where it was the hope of the prisoner to benefit his mother by his confession; in 94 Cal. 112, when it was to aid his sister; in 22 Maine, 171, where it was to save a brother.   In all these cases the confessions were admitted, but the collateral inducements under the influence of which they were made went with them, to enable the jury to determine the degree of reliance to be put upon them.   But Wilson's statements in regard to crimes committed at other times, at other places, and upon other persons, having not the least connection with the killing of Bonnecke, were not

admissible against the defendant in this case. They served to blacken his character, to arouse indignation against him in the minds of the jurors and to show him to be a monstrous criminal who was capable of any crime in the calendar; but they threw no light on the question the jury had to determine. If a conviction upon general principles could be defended, then possibly all this evidence relating to other crimes would be proper, but upon a trial for a specific crime, the evidence should bear some relation to the question of the defendant's connection with the particular crime charged. Proof of other crimes may sometimes become competent for a particular purpose, as in Commonwealth v. Ferrigan, 44 Pa. 386, where the purpose was to show the quo animo of defendant and motive; or in Goersen v. Commonwealth, 99 Pa. 388, to establish identity, deliberation or guilty knowledge; or where the two offenses are connected in character and purpose, as in Kramer v. Commonwealth, 87 Pa. 299; but the general rule as we have stated it above is recognized in all these cases and in the text-books. Many cases in support of it are cited in 6 Am. & Eng. Ency. of Law (2d ed.), p. 533.

In this connection the question raised by the fourteenth, fifteenth, sixteenth and seventeenth assignments will be most conveniently considered. These assignments all relate to the admission of the testimony of witnesses called to prove an attempt by the defendant to rob one P. A. Schwab, a resident of Altoona, on April 27, 1895. This occurred some three weeks after Bonnecke was killed, and had not the slightest connection with that crime. If it had been offered as part of the case of the commonwealth against the defendant at the trial it would have been rejected as a matter of course; but the defendant, when on the stand in his own behalf, had denied any connection with the attempt to rob Schwab, and this evidence was offered with a view to contradict him and so affect his credibility as a witness. It was probably competent for that purpose unless the answer of the defendant was made upon cross-examination under such circumstances as to make his answer conclusive upon the commonwealth. We do not find in the record that its admission was excepted to, and its admissibility is therefore not raised in any proper way. If there is ground

of complaint it is that the jury was not instructed in the purpose of its admission and the effect to be given to it by them.

The twelfth and thirteenth assignments may also be considered together. It appears that when the defendant was about to close his case in chief his counsel called the attention of the court to the fact that one witness whom they desired to examine was not present, and asked to have the privilege of calling him out of place on the following day. With this understanding, to which no objection was made, the defendant rested. On the next day the witness, a lad under thirteen years of age, came into court with his mother. He was called to the stand and the subject to which his attention was to be called was stated. Thereupon the counsel for the commonwealth objected to his examination for these reasons : First, because of his age, next, because the subject to which it was proposed to call the attention of the witness had not been stated when the right to call him had been reserved on the previous day; and last, because the evidence was not properly in surrebuttal. These objections were sustained and the witness excluded. We think this was error. The witness was not incompetent because of his age. If it was alleged that he was unacquainted with the nature of an oath he should have been examined upon that subject and, if necessary, instructed in the presence of the court. He alleged that he was fully aware of the nature and importance of an oath. He was the son of a local magistrate, and had some familiarity with proceedings in his father's court. His knowledge should have been tested before his rejection upon this ground. The second ground of exclusion was not sufficient. If the commonwealth or the court had asked, before consenting to call the witness out of order, for what purpose the testimony of the witness was wanted, it would have been the duty of the defendant's counsel to state fairly just what it was. But failing to do this, the consent of the court was given to call him out of order, and with that understanding the defendant rested his case. The calling of him when he came in was a return to the case in chief of the defendant, and if his testimony would have been competent when he was first called and found not to be in the court room it was competent when he was actually called on the following day. This disposes also of the third and last objection, that the evidence was out of order

when it was proposed to give it.　It would have been out of order but for the reservation of the right to call him when he came in, made and assented to before the defendant closed his case in chief.　The fact which the witness was expected to testify to was one which, if the jury had believed his story, would have made the conviction of the defendant impossible.　It was, that he had called at Bonnecke's house at the direction of his mother on the morning of Saturday, April 6, 1895, knocked at his door and tried to obtain admission, without success.　He had also climbed on the railing at the side of the porch and looked into the room through the window, but could see only a heap, near the door, covered with blankets, and an empty boot laying near it.　What was under the blankets he could not tell. When the officers effected an entrance into Bonnecke's house on Sunday at noon they found a heap near the door covered with blankets, and an empty boot near it.　On removing the blankets the body of the murdered man was found under them, with one boot on and the other lying empty on the floor close by, but not covered by the blankets.

The effect of the testimony of Smith was to fix the murder at an hour prior to his visit to the house on Saturday morning. Wilson was then in the county jail at Hollidaysburg, and had been for some weeks.　His release did not occur until between two and four o'clock in the afternoon of Saturday.　The rejection of the testimony of his mother who was called at the same time is the subject of the thirteenth assignment.　She was called out of order.　The right to call her had not been reserved.　It would not have been error in the learned judge if he had disregarded the question of order and admitted the witness, nor can we say it was error to sustain the objection and reject her.　Questions relating to the order of the testimony alone are quite largely in such cases under the sound discretion of the trial judge.　The remaining questions relate to the adequacy and fairness of the charge of the learned judge, and are raised by the nineteenth, twenty-first and twenty-second assignments of error.　They complain that undue prominence was given to the testimony of some of the witnesses for the commonwealth; that the theory of the defense was misunderstood and, therefore, inaccurately stated to the jury; and that the circumstances calculated to weaken the force of

the testimony of the detectives were overlooked or greatly minimized. These objections require us to look in a general way, and very briefly, at the case presented at the trial. Bonnecke was an old man, unable to work, and quite infirm. There were rumors that he had a little money laid away that he was hoarding, but there were no indications of it in his humble cabin or in his own appearance. He lived alone, in a little house containing but one room. His furniture was very poor and very scanty. His food was simple, and was mainly supplied by the charity of his neighbors. He was timid, avoided people generally, was seen but little on the streets, and usually when in the house had the doors securely locked. Most of his neighbors say that he was not seen by them, nor was light observed in his windows, nor smoke rising from his chimney after Thursday night. Some thought they saw him on Friday. Some others are of opinion that they saw him on Saturday, but on neither of these days did any of those who supplied the old hermit with food succeed in getting into his house or getting any response to their knocks on his door or other efforts to attract his attention. His house was finally entered on Sunday, as we have already stated, about the middle of the day. He was found on the floor dead. His body was covered with the old blankets he had used as covering upon his rude bed. His bed had been torn open, and presented the appearance of having contained in the middle of the straw some small round object which had been removed. His boxes had been searched and their contents left in a state of confusion. The body did not appear to have been affected by the rigor mortis at the time it was found, and there was a little pool of blood on the floor near his head which was not examined, but which the witnesses said did not appear to have coagulated. A handkerchief had been drawn through his mouth so tightly and tied so securely behind his head that the coroner thought he would have died from strangulation alone, but he had received a blow upon the head that had broken his skull vertically from its top to the base. Very soon after the discovery of this brutal murder the officers of the county determined to unravel the mystery that surrounded it, if possible, and bring the perpetrators of the crime to punishment. For this purpose the detective agency of Barring and McSweeny

was applied to, and they detailed men for the purpose of working upon the case and discovering the guilty parties if possible. The detectives caused the arrest of Wilson, and secured by means already alluded to the statements or confessions, as they are called, without which no conviction could have been had on the evidence that was given at the trial. Most of the important evidence for the commonwealth was furnished by the detectives. They and their methods were bitterly assailed by defendant's counsel. The case was exceptional for several reasons, and the duty of holding the judicial scales evenly was by no means easy of performance. But when the charge of the learned judge is considered as a whole we do not find in it any inadequacy, except as we have already pointed out, nor do we find any indication whatever of either prejudice or partiality. It is true he did not share the bitterness of the defendant and his counsel towards the work of the detectives or towards their testimony, but he left their credibility to the jury. The charge may be justly criticised to some extent for its want of fullness in its treatment of some of the subjects to which the assignments under consideration relate, but nowhere does it seem wanting in fairness, nor does it fail to bring to the notice of the jury the main questions upon which they were to pass. The objections to the charge, therefore, which assert partiality and prejudice are dismissed without further discussion. The assignments of error which we have sustained, however, require us to reverse this judgment and send the case back to the court below for another trial. The verdict may be right in finding the defendant guilty of the murder of Henry Bonnecke. We express no opinion upon that question, but if the jury was influenced or might naturally have been influenced by irrelevant considerations or by the absence of evidence that was competent and relevant, the verdict rendered by them, under such circumstances, ought not to stand. It is for this reason that the judgment appealed from is now reversed and set aside, and a writ of venire facias de novo is awarded.