## Commonwealth *v.* Zoltowski, Appellant.

*Evidence—Witnesses—Homicide — Insanity — Direct examination—Cross-examination—Jurors—Examination on voir dire.*

1. At the trial of an indictment for murder, a question asked defendant's witness under direct examination: "Did you or did you not at any time observe a change of conduct on the part of this defendant in regards to his mentality," was leading, and an objection thereto was properly sustained.

2. In such case, the court made no error in refusing to permit defendant's expert witness to express his opinion as to the de-

fendant's insanity based on the evidence which he had heard in court, where such witness had previously stated his opinion as based upon his examination of the defendant, or in refusing to permit an expert witness testifying for defendant to state whether defendant was mentally responsible when he was suffering from an insane delusion, or to allow a lay-witness who had known defendant for eight or nine years and who described certain conduct of defendant, to state whether he considered that a rational or an irrational act.

3. In such case, where defendant's witness, having testified as to defendant's reputation as a law-abiding citizen, was asked on cross-examination: "Do you know whether he (defendant) killed a man or not," and replied, "I don't know," it was not error to refuse to strike out the question and answer.

4. In such case, the court made no error in refusing to permit a juror examined on his voir dire to be questioned as to whether he had any conscientious scruples against insanity as a defense in a murder trial.

*Criminal law—Murder—Insanity—Charge to jury—Correct instructions.*

5. At the trial on an indictment for murder, it appeared that defendant met deceased in a street; that defendant who had a shoe box under his arm, walked up to deceased, pulled a pistol from the box, shot deceased twice and then turned and started to run, when he fired a third shot. The shots killed deceased. The Commonwealth did not prove a motive for the killing. The defense was that defendant was insane when he fired the shots, and evidence was offered that he was the subject of insane delusions that people were trying to poison him and that his wife had been unfaithful to him. The trial judge charged the jury to the effect that if by reason of insanity the defendant did not know the difference between right and wrong, that his mind was so diseased in relation to these delusions that there was an irresistible, overwhelming force driving him on and impelling him to commit the crime, he was entitled to an acquittal, but that if they should not so find, then they should take into consideration the circumstances of the shooting with a view to determining whether defendant was guilty and the degree of guilt, if any. The jury found a verdict of guilty of murder of the second degree, upon which sentence was passed. *Held,* no error.

Argued May 18, 1914. Appeal, No. 164, Jan. T., 1914, by defendant, from judgment of O. & T., Bradford Co., Dec. T., 1913, No. 1, on verdict of guilty of murder of the

second degree, in case of Commonwealth v. Anthony Zoltowski. Before BROWN, POTTER, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Indictment for murder. Before MAXWELL, P. J.

The facts appear in the following excerpt from the charge to the jury:

The defendant, Anthony Zoltowski, is before you, charged with the crime of murder. The indictment which has been found against him alleges "that on the 12th day of September, 1913, within this county, and within the jurisdiction of this court, with force and arms, and so forth, he did feloniously, wilfully and of his malice aforethought kill and murder one, Bert J. Hern."

There appears to be no dispute as to the fact of the homicide having been committed on the 12th day of September, 1913, at about the hour of 12:00 noon to 12:15 p. m., upon Bert J. Hern, a citizen of South Waverly, this county, by pistol shots, fired by the defendant. The shot, or shots, took effect as described by Dr. L. S. Betowski, who held the autopsy upon the body of the deceased very soon after the shooting, where the body had been taken, to the undertaker's in Waverly, N. Y., and he has fully described the course of the bullet, or bullets, after they entered the body of the deceased, causing in his judgment almost instant death. The doctor also arrived at the store before the deceased expired. His evidence upon that subject is as follows: "Q. Did you arrive there before Mr. Hern died? A. Yes. Q. Describe his condition when you arrived. A. Mr. Hern was lying on the floor; I should say he breathed about three or four times. He was practically dead—pulseless. Q. How long after you arrived there was it before you pronounced him dead? A. Oh, it couldn't have been two minutes. Q. About what time in the day was that? A. I should judge it was between 12:00 and 12:30. Q. Then the body, as I understand, was taken to the undertaking establishment over in

Waverly, or South Waverly? A. Waverly. Q. Who, any one, assisted you in performing the autopsy? A. Dr. Harry Fish of Sayre." It will not be necessary to read all of his testimony on that subject, but he was asked this question, after describing the course of the bullets: "Q. Are you able to state, doctor, what caused the death of Mr. Hern? A. Yes, sir. Q. What caused his death? A. Bullet wound of the heart. Q. Were the bullets marked there in your presence, that you took from the body and from the clothing? A. Yes, sir."

James Keegan, I think the chief of police of South Waverly Borough, was called and he testified that he was acquainted with Bert Hern; at the time of the committing of the homicide he was about 200 to 300 feet away from where the parties were, on the opposite side of the street, and he was asked these questions: "Q. Did you see the shooting? A. Yes, sir. Q. Describe to the jury what you observed of the shooting. A. Well, this man was coming along—Q. Which man? A. The defendant in the case. Q. Anthony Zoltowski? A. Anthony Zoltowski—and had a shoe-box under his arm. Q. Which arm? A. Under his left arm—and he came up, I could see about ten feet—he came up where this Bert Hern stood. Q. Where was Mr. Hern standing? A. Outside the door. Q. Between the two show-windows? Just describe where he was standing? A. He was standing on the south side of the store door, and Tony was along, came along, and he walked right up to him, a little bit on the south side of him, and he put his hand in this box, pulled the gun and shot him. Q. How many times did he shoot? A. Three. Q. In how rapid succession did he fire those shots? A. Very quickly, very quick. Q. What if anything, did he do while he was shooting? A. Well, the first two shots were very quick, and then he turned and started away, started to run when he shot the third time. Q. What was Mr. Hern doing at the time when

Zoltowski approached him and fired the shots? A. He was standing right there."

Then Miss Alice Diltz was called, and she was the lady that works at the store. She described the hour when the shooting took place, and she says she heard the two shots; she looked up, and the defendant at about that time started to run, and as he was about to run, or start to run, he turned and fired the third shot. Mr. Hern turned and came in the store, and said, "do you suppose I am shot?" he said "I believe I am," and I said "shall I go for a doctor," and he said "get some one," and he turned and gasped and fell down on the floor.

Lester Swain, the merchant for whom Mr. Hern was working, stated that he was telephoned to and came over immediately, and when he arrived he found Mr. Hern lying on the floor.

A. J. Golden was called, and he said he was about sixty feet away, on the opposite side of the street, sitting in his front window, and that he heard the first shot and he looked up and saw the defendant fire the second shot, and that the defendant stood within four feet of Mr. Hern, and that he turned when he fired the third shot. "I saw him for about twenty rods, and he was running."

Dr. Charles Reed was called and he has examined the defendant, and says he is suffering from paranoia, or chronic form of delusions. On cross-examination he testified that the only delusion was about his wife and those men, that occurred twenty years ago. He said that it was such a marked condition of mind that would lead a man irresistibly to commit crime. "He said to me he wanted to right a wrong"; that is, he asked him why he committed this act, and the defendant said to him he "wanted to right a wrong," and said at first he only intended to hurt him, and that after the first shot he "went wild" and didn't know what he did. That is the statement of Dr. Reed—that at first he only intended to hurt him, but after the first shot he "went wild" and then

didn't know what he did. He said it had been in his mind for a long time to avenge this wrong.

Dr. D. L. Pratt was called. Doctor examined the defendant in December last and found him suffering from paranoia, and he says it is a slow form of insanity in its development—"some paranoiacs are running at large to-day, and are called cranks, which have homicidal tendencies. This is characterized by certain delusions, which will produce an irresistible impulse to kill." Upon cross-examination he said his delusions were that people were trying to kill him; and then he also referred to this delusion about the relations with his wife twenty years ago at Antrim; and he says in his judgment as a professional man that it is incurable.

Now, gentlemen, this is in brief the evidence on the part of the defense.

The evidence on the part of the Commonwealth you will recall in a general way—the testimony of the eye-witnesses, who saw this transaction, which we have previously called to your attention, together with the evidence of the doctor at South Waverly who made the post mortem examination, and it will not be necessary to go over that evidence again—you will recall that, because it is very brief.

The presumption is that the defendant is a person of good reputation. A number of witnesses, as I have gone over the testimony, I have called to your attention, who have testified to the defendant's good reputation. Now, the application of that evidence is this: the presumption is that the defendant is a person of good reputation, and in considering the testimony offered by the defendant to reinforce this presumption all reasonable doubts are to be resolved in favor of the defendant. The defendant has called several witnesses—neighbors and acquaintances, who testified to his good reputation and character as a law-abiding citizen. This evidence is to be weighed and considered in connection with the other evidence in the case, and to be given due weight and

consideration in determining the facts in this case which are submitted to you. The law presumes every person sound and sane—that being the normal condition, and when insanity of the defendant is set up as a defense, it is incumbent on the defendant to rebut the word "presumption of sanity" and show by fairly preponderating evidence that he was insane at the time of committing the alleged crime. A reasonable doubt of the fact of insanity, on the other hand, is not sufficient to acquit.

Now, gentlemen, take this testimony and determine under the evidence whether or not the defendant is guilty of the commission of any crime and if so, what it is, or whether he is not guilty.

The Commonwealth contends that the fact that the defendant used a deadly weapon, and that that deadly weapon was aimed at a vital part of the body of the deceased, and that the circumstances surrounding the commission of the crime are sufficient to show that the defendant intended, and was conscious at the time, and knew the difference between right and wrong by the act and manner of committing the offense, and the circumstances surrounding it, and is therefore guilty of murder of the first degree. In determining that question, gentlemen, take into consideration his flight. The evidence shows that he immediately started to run away, and he was pursued by the officers, who fired a revolver in the air several times before they were able to overtake the defendant; that he was overtaken somewhere down by the railroad track, and was thrown upon the ground, and resisted in the first instance, arrest. Also take into consideration while he was running away he threw away the box that he had, in the course of his flight. Also take into consideration that he had two revolvers, loaded— one a 32 caliber, I think, containing five, and another one, a 38 caliber, containing six chambers, also he was well supplied with cartridges. Something has been said in the course of the arguments about some of the cartridges being wound with paper. You will have the privi-

lege of taking these out with you, and examining them. You will observe in the revolver where three are discharged, are those cartridges that are wound with paper, that were used on this occasion. You will have them out with you and you can examine them for yourselves. Take those matters all into consideration. Also take into consideration when was it, if the defendant had these two revolvers in the box, (I think one of the witnesses describes—perhaps the chief of police) that he saw him take the revolver out of the box—if he had these two revolvers in the box when he fired the shot that killed the deceased, when did he take the other revolver out and put it in his pocket? Take those circumstances all into consideration. Also take into consideration in determining this question that when in the lock-up he took his cousin to one side and asked him to come in alone, so that he could give him this one revolver that he had in the lock-up there, and his cousin informed someone else of it ard they went in and got it. Take into consideration also his statement to Dr. Reed, when he was examining him—talking with him—that at first he didn't intend to kill him but only to injure him, but after he fired the first shot he then became excited or mad and didn't know what he was doing. Take that all into consideration—take all the facts and all the circumstances into consideration in determining whether or not the defendant is guilty; and if guilty, what crime he has committed under the law and under the evidence. Of course, it makes no difference what the crime was that he committed if, at the time, he didn't know, by reason of insanity, the difference between right and wrong; that his mind was so diseased he could not form an intention to take life; or that if he did know the difference between right and wrong, was his mind so diseased, in relation to these delusions, that there was that irresistible, overwhelming force driving him on and impelling him to commit this crime, and he hadn't the power or the intelligence to resist. If you find that to be true,

we think he is entitled to an acquittal on the ground of insanity.

The credibility of the witnesses, gentlemen of the jury, is entirely for you. You have seen the witnesses upon the stand; you have heard their testimony. Reconcile the testimony, if there is any dispute, wherever you can. In order to determine how much weight you will give to a witness, take into consideration their appearance, the relationship which they bear to the defendant, their means of knowledge to which they testify, the circumstances, and take that all into consideration and determine where the truth lies in this matter.

If you find the defendant guilty, it would be your duty under the law to determine the grade of the crime—either guilty of murder of the first degree, or guilty of murder of the second degree, or guilty of voluntary manslaughter, as we have previously defined it and instructed you; or, if you find the defendant not guilty of any crime, by reason of insanity, then you will return in your verdict, "We find the defendant not guilty by reason of insanity." That must be the form of the verdict.

The Commonwealth did not prove a motive for the killing. The defense offered evidence that defendant had for many years been subject to insane delusions that people were trying to poison him and that his wife had been unfaithful to him.

Verdict of guilty of murder in the second degree.

The trial judge sentenced the defendant to undergo imprisonment by separate and solitary confinement for the period of not less than nineteen years and not more than twenty years. Defendant appealed.

*Errors assigned* were (1-2) misleading and inadequate instructions to the jury, and the third, fourth, fifth, sixth, seventh, eighth, ninth, which were as follows:

(3) The court below erred in sustaining Common-

wealth's objection to the question of defendant's counsel and in rejecting the testimony, as follows:

Defendant's witness Frank Bogaczynski, being on the stand under direct examination:

Q. Did you or did you not at any time observe a change of conduct on the part of this defendant in regards to his mentality?

Mr. Culver, District Attorney: Objected to as leading.

The Court: The objection sustained, and the evidence excluded. An exception is noted for defendant, and a bill sealed.

(4) The court below erred in sustaining Commonwealth's objection to the question of defendant's counsel and in rejecting the testimony, as follows:

Defendant's witness, Dr. D. L. Pratt, being on the stand under direct examination; having given the opinion that the defendant was insane, was asked:

Q. Doctor, you have been in court during the trial of this case somewhat? A. I have heard some of the evidence.

Q. Will you state to the court and jury upon what you base your opinion, if anything, aside from your examination as to the condition of this defendant? A. Am I to pass my opinion as to the evidence that I have heard?

Q. Yes.

Mr. Culver, District Attorney: Objected to.

The Court: The doctor has stated his opinion as based upon his examination. The objection is sustained, and the evidence excluded. An exception is noted for defendant, and a bill sealed.

(5) The court below erred in sustaining Commonwealth's objection to the question of defendant's counsel and in rejecting the testimony, as follows:

Defendant's witness, Dr. D. L. Pratt, being on the stand under direct examination; having given the opinion that defendant was insane, was asked:

Q. Doctor, you have heard a portion of this case in court? A. Yes, sir.

Q. Have you heard the evidence of witnesses called upon behalf of the defendant, who have testified as to the acts of the defendant? A. I have heard some of them.

Q. Will you express your opinion as to the sanity or insanity of the defendant, upon the evidence in relation thereto, which you have heard in court in this case?

Mr. Culver, District Attorney: Objected to, as incompetent.

The Court: The objection sustained, and the evidence excluded. An exception is noted for defendant, and a bill sealed.

(6) The court below erred in sustaining Commonwealth's objection to the question of defendant's counsel and in rejecting the testimony, as follows:

Defendant's witness, Dr. L. S. Betowski, being on the stand under direct examination:

Q. What time of day did you visit him in the lock-up at South Waverly, about, doctor? A. I should say some time between 3:00 and 4:00 in the afternoon.

Q. What would you say as to his condition at that time? My previous question was directed towards your examination yesterday; I am now asking from your observation at that time what his condition was, in your judgment? A. Well, his condition at that time was practically the same as it was yesterday.

Q. Can you say to the court and jury whether or not his delusions at that time bore any similarity to his delusions as you discovered them yesterday? A. Yes, sir.

Q. Has he more than one—on more than one subject, any delusions? A. He has this delusion of people wanting to poison him and of somebody watching him all the time besides this other one—the main one, though, was in regard to his wife.

Q. This defendant, while suffering from one of these

delusions, in your judgment, doctor, is he mentally responsible?

Mr. Culver, District Attorney: Objected to, as an improper question. It is not the proper test.

The Court: The objection is sustained, and the evidence excluded. An exception is noted for defendant, and a bill sealed.

Mr. Mills, counsel for defendant: The witness being called and qualified by both sides of the present case as an expert, the defense contends that the question is proper.

(7) The court below erred in sustaining Commonwealth's objection to the question of defendant's counsel and rejecting the testimony, as follows:

Defendant's witness, H. W. Kinney, having testified on examination in chief that he had known defendant for eight or nine years and described certain conduct of the defendant which he had witnessed, was asked:

Q. Did you consider that a rational or irrational act?

Mr. Culver, District Attorney: Objected to, as incompetent.

The Court: The objection sustained, and the evidence excluded. An exception is noted for defendant, and a bill sealed.

(8) The court below erred in sustaining Commonwealth's objection to the question of defendant's counsel and refusing to permit an examination of the juror as follows:

D. C. Lampman, a juror, being examined on his voir dire, was asked:

Q. Have you any conscientious scruples against insanity as a defense in a murder trial?

Mr. Culver, District Attorney: Objected to, as an improper question.

The Court: The objection sustained, on the ground the question is an improper question. An exception noted for defendant, and a bill sealed.

(9) The court erred in overruling the motion of defendant's counsel and refusing to strike from the record the question and answer, as follows:

Defendant's witness, Chas. O. Hoagland, being on the stand, and having testified to his reputation as a law-abiding citizen, was asked on cross-examination:

Q. Do you know whether he killed a man or not? A. I don't know.

Mr. Mills, counsel for defendant: We move to have that stricken from the record—the question and answer.

The Court: The motion is refused, and the evidence stands. An exception is noted for defendant, and a bill sealed.

*W. G. Schrier* and *Charles E. Mills,* for appellant.

*Charles M. Culver,* District Attorney, for appellee.

PER CURIAM, July 1, 1914:

The appellant was convicted in the court below of murder of the second degree. The first two assignments of error complain of the charge of the court as being misleading and unfair. It covers fifty-eight pages of printed matter, and we have not been persuaded that the learned judge failed to fully instruct the jury on any feature of the case, or that the charge is open to the criticism contained in the second assignment. The remaining seven assignments, complaining of rulings on offers of evidence, and of the refusal to allow a question asked a juror on his voir dire, are equally without merit, and the judgment is affirmed.