## Commonwealth *v.* Corrie, Appellant.

432

Argued November 24, 1930. Before FRAZER, C. J., WALLING, SIMPSON, KEPHART, SADLER, SCHAFFER and MAXEY, JJ.

*Charles J. Margiotti* and *Harry W. Petrikin,* for appellant.—Refusal of the court to note an exception to

the charge nunc pro tunc, in accordance with the Act of May 24, 1923, P. L. 439, was error.

Failure of the court to charge on the presumption of innocence and reasonable doubt, was error: Com. v. Madieros, 151 N. E. (Mass.) 297; Com. v. Russogulo, 263 Pa. 93; Com. v. Holgate, 63 Pa. Superior Ct. 246; Com. v. Hoskins, 60 Pa. Superior Ct. 230; Com. v. Colandro, 231 Pa. 343; Com. v. Barish, 297 Pa. 160; Com. v. Stankus, 71 Pa. Superior Ct. 286; Com. v. Hull, 65 Pa. Superior Ct. 450; Com. v. Nunamaker, 84 Pa. Superior Ct. 97; Pannell v. Com., 86 Pa. 260.

Improper treatment of evidence by the court, was error: Com. v. Westley, 300 Pa. 16.

*Xopher Beck*, District Attorney, with him *James L. Colbert*, for appellee, cited: Com. v. Russogulo, 263 Pa. 93; Com. v. Welch, 291 Pa. 40; Com. v. Green, 292 Pa. 579; Com. v. Scott, 38 Pa. Superior Ct. 303.

OPINION BY MR. JUSTICE MAXEY, January 5, 1931:

Elliott Dick was shot and killed at Dudley, Huntingdon County, on February 1, 1930. The appellant, Isaac Corrie, was jointly indicted with one Antonio Champi for Dick's murder. Separate trials were had. Champi was convicted of voluntary manslaughter, and a few months later appellant, Corrie, was convicted of the same offense. Corrie was sentenced to the Western Penitentiary for not less than five nor more than ten years.

The shot that killed Dick was fired by Champi. The theory of the Commonwealth was that Champi and Corrie were acting in concert. The Commonwealth offered evidence to the effect that at 5 P. M. on the day of the homicide Champi and Corrie were together at Minersville, Pa., and that they were later seen together, at about 7 : 15 P. M., going toward Dudley, at which time Corrie was heard to say: "I will shoot the son-of-a-bitch"; and that Corrie was later seen in John Sutor's store, in Dudley Borough, in the company of Champi,

where Corrie asked for 25 automatic shells and displayed an automatic pistol. The Commonwealth also offered evidence to the effect that Corrie at that time said: "Bootie [Elliott] Dick wants to stay away from me to-night." Freda Dick, a sister of the deceased and a witness for the Commonwealth, testified that she saw Champi and the appellant, Corrie, about 7 : 15 P. M., on the evening of the shooting, at which time she heard Corrie say: "We are going to get him," but she did not know to whom he was referring. In his confession Corrie admitted he knew that Champi intended to shoot Dick and that Champi had said: "Come on, Ike; we will go up and get Bootie." Shortly before the shooting, Corrie and Champi came together into Falchieni's store at Dudley and found Dick there. Champi provoked a quarrel with him and asked him to come outside. The deceased declined to do so. Champi reached to his belt as if to draw a weapon, and Dick, apparently sensing this, pushed Champi away. Champi then fired one shot, which struck the deceased in the leg. The deceased and Champi then grappled for possession of the gun, which was in Champi's hand. At this time Corrie jumped on the back of the deceased and held him. Champi got his hand loosened and, pointing the gun under Dick's nose, fired the second shot, which proved fatal. At that time, and for a short time previously, Corrie was holding the deceased around his back. Corrie claimed that he was merely trying to separate Dick and Champi, but this claim was apparently rejected by the jury.

On September 23, 1930, three days after the verdict was rendered, the defendant was sentenced as above stated.

No exception was taken by defendant's counsel to any of the court's rulings or instructions. Later, additional counsel was engaged and on October 21, 1930, a motion was made that the court note upon the record an excep-

tion to the rulings of the trial judge and an exception to the charge. The motion was refused.

The second assignment of error is based on the denial of defendant's motion to have noted the above exception. Appellant's counsel contends that this refusal was "a flagrant abuse of discretion on the part of the court," and cites the Act of May 24, 1923, P. L. 439, reading, inter alia, as follows: "A general exception may be taken to the charge......, at any time before the verdict is rendered, or thereafter by leave of the court." This assignment of error must be overruled. The principle is established in the civil and criminal procedure of Pennsylvania that only those rulings of the trial judge can of right be made the basis of assignments of error which are excepted to promptly after they are made, and the charge of the trial judge can of right be made the basis of assignment of error only when a general exception is taken to it before the verdict is rendered. Such latter exception, however, is not construed as an exception to any matters of fact inadvertently misstated by the court unless the court's attention is called to the alleged misstatement prior to the taking of such exception. Good practice and the orderly conduct of trials demand that all exceptions to the charge be noted before the jury retires, as it is somewhat incongruous for a trial judge to call a jury back and modify his instructions after the jury has begun its deliberations. The allowance of an exception to the charge after the verdict is rendered is entirely within the discretion of the trial court. Failure of counsel to take prompt exception to the trial judge's rulings or instructions, indicates acquiescence in them, while exceptions put the trial judge on notice that his rulings or instructions are not acquiesced in, and this suggests to him further consideration of these rulings or instructions and modification of them, if, upon reflection, he is convinced of error. If the taking of exceptions were not made a prerequisite to the right to

436

appeal on controverted points, many erroneous rulings and instructions would stand uncorrected by the trial judge and retrials would become more frequently necessary. The rule, therefore, becomes a precept essential to the prompt and practical administration of justice, and while a few litigants may suffer on account of their counsel's inattention to this rule, society profits from this precept and from judicial exaction of obedience to it. That this rule is established in the procedure of Pennsylvania, is indicated by the following authorities: Morris v. Buckley, 8 S. & R. 211; Curtis v. Winston et al., 186 Pa. 492. In Com. v. Van Horn, 188 Pa. 143, 159, this court held that a belated exception "has no efficacy, and could not avail, even if it had merit." In Sibley v. Robertson, 212 Pa. 24, this court speaking through Mr. Justice MESTREZAT said: "We must disregard the last eight assignments which allege error in the court's answers to the requests for instructions embraced in the points for charge presented by the appellant. No exceptions were taken to the rulings of the trial court and hence they cannot be assigned for error. This is to be regretted as those rulings raise material questions in the case...... By reason of the failure to except to the court's rulings on the points presented, we cannot determine these vital questions." The same view of the necessity of taking exceptions prevails in the United States Courts: Reagan v. Aiken, 138 U. S. 109, 113; Pacific Express Co. v. Malin, 132 U. S. 531, 538.

Should a case arise where a defendant was being hurried to an undeserved doom by reason of the carelessness of his counsel in not taking exceptions to palpable errors which offend against the fundamentals of a fair and impartial trial, the appellate courts would, without being recusant to this salutary rule, find a way to avert the injustice threatened. Some invasions of rights amount to a deprivation of that due process of law guaranteed by the federal Constitution and, in different

phraseology, by the state Constitution, which has been defined as follows: "Due process of law in each particular case means such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs": Cooley's Constitutional Limitations, 8th edition, volume 2, page 741. For any denial by a trial court of due process of law, the appellate court will afford relief. Law must be the servant of justice, and courts of justice will not be blind to any breach of basic rights or impotent to vindicate them. But here there is no such breach, no denial of due legal process and no manifest injustice.

The principal error appellant complains of is the failure of the trial judge to charge the jury that defendant was presumed to be innocent. This is the subject-matter of the third assignment. While the failure to charge as to the presumption of innocence in a criminal case is not to be commended and should not become a practice, it is well settled that it does not constitute reversible error provided the trial judge instructs the jury that the burden is on the Commonwealth to prove the defendant guilty beyond a reasonable doubt: Com. v. Holgate, 63 Pa. Superior Ct. 246, 257. Stephens in his History of the Criminal Law, volume 1, page 437, declares that "the presumption of innocence is otherwise stated by saying the prisoner is entitled to the benefit of every reasonable doubt."

The fourth assignment is that "the court erred in failing to charge the jury that the guilt of the defendant must be established beyond a reasonable doubt." It is true that the court nowhere gave that express instruction, but throughout its charge the court used the phrase "beyond a reasonable doubt" more than a dozen times. For example, the court said: "Do you believe beyond a reasonable doubt that this defendant, Isaac Corrie, before the shooting combined with and entered into an

agreement with the man that actually did the shooting, Antonio Champi, to take the life or inflict serious bodily harm upon Elliott Dick?" Again, the court said: "Unless you believe that beyond a reasonable doubt, the verdict should be not guilty." Again: "By a reasonable doubt we do not mean one that you bring up in your own mind to escape an unpleasant duty, but one that makes you hesitate after looking over all the evidence before believing the defendant guilty. It is one that makes you hesitate before believing the existence of anything as a fact in your everyday experiences of life in a matter in which you are personally concerned, and if you have a doubt about it that is what we mean by reasonable doubt. If that exists in this case the defendant is entitled to the benefit of it and to an acquittal." Again, the court said: "If you are not satisfied beyond a reasonable doubt that the defendant and Champi were acting in concert up to the time of the shooting, with a common design to take the life or do great bodily harm to Dick, if not satisfied of that beyond a reasonable doubt, you need inquire no further into the facts of this case, because if that did not exist, if a combination did not exist, then what transpired in the store is immaterial in this case and the verdict should be not guilty." We think that, in the excerpts quoted, and in similar examples throughout the charge, the court by clear implication charged the jury that the guilt of the defendant must be established beyond a reasonable doubt, before a verdict of guilty could be rendered against him.

The fifth, seventh and eighth assignments relate to the alleged failure of the court to review the testimony of all of defendant's witnesses and to other alleged inadequacies of instruction. These if regarded as prejudicial should all have been called to the court's attention by counsel at the close of the charge.

The sixth assignment is that: "The court erred in stating in its charge that Antonio Champi was now being punished for the same crime. The portion of the

court's charge referred to was as follows: 'Antonio Champi, the man who did the shooting, who is now being punished for the crime, testified [etc.].' " Appellant argues that this remark by the court "was a subtle and insidious argument for conviction, since it suggested to the minds of the jurors that, since Champi was being punished for the crime, his alleged partner in the charge should also be punished." The remark of the trial judge was an irrelevant interpolation but it does not amount to reversible error even though it might have had a certain psychological implication adverse to the defendant. It might also have had a similar implication in his favor, for the minds of some of the jurors might have received from this remark the suggestions that the actual killing was done by Champi, that he was being punished for it and therefore the ends of justice had already been met. Although a trial judge should not in his charge refer to crimes committed by defendants not on trial (except when there are special and proper reasons for doing so), the remark quoted, even if excepted to, would not justify reversal.

It would have been unnecessary for us to consider any other assignments after overruling the second, but we have reviewed all of them to show that no injustice resulted to the appellant by reason of the failure of his counsel to except to the instructions of the court.

All the assignments of error are overruled, the judgment is affirmed, and it is ordered that the record be remitted to the court below, to the end that the sentence imposed may be carried out.