## Commonwealth *v.* Carluccetti, Appellant.

Argued September 28, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*William H. Saye,* for appellant.

*Carl B. Shelley,* District Attorney, with him *Huette F. Dowling,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE JONES, January 7, 1952:

The appellant, Guerino Carluccetti, was tried upon two indictments charging him, respectively, with the murder of Emilio and Laura Giovannetti, a husband and wife. The defense was insanity at the time of the killings. The jury found the defendant guilty of murder in the first degree on each indictment and fixed the penalty at death. Motions for a new trial were filed and overruled; and the defendant took these appeals from the judgments of sentence entered on the verdicts.

The homicides were committed in the early morning of April 2, 1935, in the village of Swatara Station, Dauphin County, which adjoins the town of Hershey on the west. Carluccetti was then thirty-eight years old, married and living with his wife and two minor daughters in a dwelling at Swatara Station. For at least fifteen years next preceding the day in question, he had been employed by the Hershey Chocolate Corporation.

The defendant was arrested by police officers shortly after the killings and was placed in the custody of the Pennsylvania State Police at their training school in Hershey. While there, he made a full and complete statement on the afternoon of the same day, under interrogation by police officers, as to his perpetration of

the homicides and the attendant as well as the immediately antecedent circumstances. A State policeman typed the statement which Carluccetti signed and swore to before a local justice of the peace, his signature being witnessed by three subscribing State policemen. Further investigation, which the State police promptly undertook, developed the fact that Carluccetti had priorly complained to friends and acquaintances that the victims of his homicidal assault had been making false and slanderous statements concerning him. Because of this information, the State police on the succeeding day (April 3rd) took a second statement from the accused at the State police barracks in Harrisburg in the presence of a county detective and four State policemen. That statement confirmed the first in all respects and contained the additional matter as to the slanders which Carluccetti said had been circulated about him; it was likewise reduced to typewritten form and signed by him. Both of these statements were received in evidence at trial over the defendant's objections. There neither was nor is, however, any suggestion nor intimation that the statements were obtained as a result of intimidation or overreaching on the part of the police. Not only was the accused informed by the police of his right to remain silent, but, in the second statement, he expressly averred that his counsel (identified by name) had instructed him that he did not have to make any statement if he wished not to do so. Nor were the statements otherwise impugned so far as the participation of the police in obtaining them is concerned. After the second statement had been taken, Carluccetti was lodged in the Dauphin County jail at Harrisburg to await trial on anticipated indictments for murder which were duly returned.

On May 1, 1935, at the request of the defendant's family, he was examined in jail by Dr. Irving J. Spear, a neurologist and psychiatrist of Baltimore, Maryland;

and on subsequent petition of counsel for the defendant, the Court of Oyer and Terminer of Dauphin County on May 24, 1935, appointed a commission to examine into the defendant's current mental capacity. On June 24, 1935, the commission, having heard several witnesses of whom Dr. Spear was the principal one, reported to the court that the defendant then lacked the mental capacity requisite to his standing trial; and, by order of court entered on the same day, he was transferred to the Farview State Hospital at Waymart, Wayne County, Pennsylvania. He remained there until May 20, 1949, when, upon petition of the Superintendent of the hospital, setting forth that Carluccetti was sane, the Court of Oyer and Terminer of Dauphin County entered an order releasing the defendant from the State Hospital to the custody of the Sheriff of Dauphin County to await trial on the two indictments for murder standing against him. The trial was had in September 1949 with result as already stated.

The defendant admits having killed the Giovannettis which, under the evidence, is an indisputable fact. His sole defense was that he was insane at the time of the killings. A recital of the facts is essential to a consideration of the eight reasons which the appellant advances why the convictions should now be set aside and a new trial granted.

On the morning of Sunday, March 31st, two days before the homicides, the defendant went to Lebanon, Pennsylvania, where he asked his cousin, Warren Ceresini, to take him to Philadelphia to see a doctor. Ceresini agreed and the two of them set out in his automobile. En route, the defendant told his cousin that he wanted to see their uncle, Henry Selvaggi, in Philadelphia. When asked why, "He said that there were people around Hershey talking about him [Carluccetti], that he was in the Black Hands." He said that the people who were doing the talking were Emilio and

Laura Giovannetti and one Ottavio Pace and that "If they didn't stop talking about him he would kill them." The defendant saw his uncle upon the latter's return home from work in the late afternoon and, in private, complained to him that people "where he lived" were bothering him and calling him "all kinds of names." Upon the uncle's counselling him to "go home and stay with your family, and don't tangle with them people," the defendant told his uncle that if "them people bother me too much, if they keep on bothering me and calling me Black Hand, some day I will kill somebody." The visit ended shortly thereafter and Ceresini then drove the defendant home. The things that the Giovannettis and Pace, or one or the other of them, were saying about the defendant, according to him, were that he was a member of the Black Hand, that he had tried to have improper relations with Mrs. Giovannetti, and that he had been guilty of some unnatural practices.

About 6:15 a. m. on April 2nd, Ottavio Pace, on his way to work, was walking on the sidewalk in front of the defendant's home. The defendant was in the yard digging a small hole to plant a bush. Pace greeted the defendant and asked him why he was not going to work, receiving a response from the defendant that he was "off today". When Pace had walked on six or seven feet, he heard a shot. He turned around and asked the defendant, "Bill, what are you shooting for?" Pace then ran across the street to where his brother-in-law, Alfonse Carluccetti (a brother of the defendant) and Joe Pompino were standing and urged them to "Do something, he is shooting me." The defendant with revolver in hand, having followed Pace, warned "Let him be, I want to finish him." He then fired three more shots, two of which struck Pace, as had also the first shot, as evidenced by the fact that Pace had three bullet wounds in his body. He recovered, however, and testified at trial.

After shooting Pace, the defendant proceeded a distance of some two hundred feet to a double frame dwelling house the one side of which was occupied by the Giovannettis and the other side by a family named Martini. An alleyway to the rear ran along either side of the house. The defendant, passing in front of the Giovannetti portion of the dwelling, used the alleyway on the Martini side in order to get to the rear of the Giovannetti residence. At the back stoop of the Martini home, Basilio Martini, the father of the family, was bending over brushing some dirt from his trousers. The defendant, "afraid", as he later explained, that Martini "was going to stop [him] from going to the Giovannetti house", shot him. The wound was not serious and Martini recovered but died of natural causes some time before the trial.

Going to the rear door of the Giovannetti home, which was closed and apparently locked, the defendant threw his weight against the door and, breaking it open, entered. Mrs. Giovannetti came downstairs, but, seeing the defendant, who had his automatic revolver in his hand, she ran back upstairs and her husband came down with a shotgun. Giovannetti asked the defendant the reason for the commotion. The defendant deceptively told him that someone had shot him which caused Giovannetti to go to the doorway leading to the outside whereupon the defendant shot him several times from behind. Giovannetti wheeled around and the defendant shot him again in the chest. The wounds proved immediately fatal and Giovannetti fell to the floor. The defendant then fired a shot up the stairway but did not hit anyone. He laid his revolver on a table (saying later that it then contained two cartridges which he had reserved to kill himself) and picked up from the floor the shotgun which he unbreached and found to be not loaded. He went upstairs with the shotgun and followed Mrs. Giovannetti

who was backing toward the bathroom. There, she either slipped or fell into the bathtub where the defendant rained blows upon her head with the shotgun until he had beaten her to death.

Having killed the Giovannettis, the defendant took his revolver from the table, left the house and retraced his steps toward his home. On his way there, his fourteen year old daughter knocked the gun from his hand. He was at once overpowered by a bystander and placed in the custody of the police.

In support of his defense of insanity, the defendant relied upon the testimony of Dr. Spear, the neurologist and psychiatrist who had examined him a month after the killings and had testified before the commission in June following. On the question of the defendant's mental condition at the time of the homicides, the Commonwealth called in rebuttal some fifteen witnesses most of whom had been associates or acquaintances of the defendant for many years up to the time of the homicides and had been friendly with him either in the community where he lived or as fellow workers or lodge members.

The appellant's principal contention is that the evidence was insufficient to warrant verdicts of murder in the first degree with the penalty of death. In the light of the testimony adduced by the Commonwealth, most of which is undisputed, the appellant can mean only that the fair preponderance of the evidence established that the defendant was insane at the time of the homicides and, therefore, was not legally responsible for them. Assuming for the moment that the appellant knew what he was doing when assaulting his victims and knew that his conduct was wrong (both of which facts the jury's verdicts established), there can be no question that the elements of willful, deliberate and premeditated murder were present. The distinguishing feature of murder, namely malice, was present. The

killings were unlawful and, being such, malice was directly inferable from the conduct of the perpetrator: see *Commonwealth v. McLaughlin,* 293 Pa. 218, 222, 142 A. 213. "A felonious killing is inherently malicious and, without more, the crime qualifies as murder as a matter of law: see *Commonwealth v. Wucherer,* 351 Pa. 305, 310-311, 41 A. 2d 574": *Commonwealth v. Samuel Jones,* 355 Pa. 522, 525, 50 A. 2d 317. And, where there is a specific intent to take life, which may be inferred from the fatal use of a deadly weapon against a vital part of the victim's body, a verdict of murder in the first degree is justifiable: see *Commonwealth v. Samuel Jones,* supra, at p. 526 and cases there cited.

As sanity is the legally recognized normal condition of human beings, its existence in any given instance is presumed. Consequently, the burden of proving insanity as a defense to a criminal charge is upon the one asserting it. It is incumbent upon him to establish the alleged defective mental condition by a fair preponderance of the evidence: *Commonwealth v. Iacobino,* 319 Pa. 65, 68, 178 A. 823. Throughout, the issue remains one of fact for the jury to determine. As recognized for this court in *Commonwealth v. Iacobino,* supra,—"The presumption of sanity, which is the normal condition of man, 'holds good, and is the full equivalent of express proof until it is successfully rebutted [citing cases]' "; or, as otherwise stated in the *Iacobino* case (p. 69),—"Where mental capacity at the time of the act is an issue, the Commonwealth is aided by the presumption of sanity, it is not required to prove affirmatively mental capacity to commit the act."

The evidence amply supports the jury's conclusion that the defendant was sane at the time of his commission of the homicides. The proof which the defendant offered as to his mental condition failed to overcome the presumption of sanity. The testimony of his expert, Dr. Spear, upon which he so largely relied, was uncon-

vincing to the jury. On the other hand, the lay witnesses whom the Commonwealth called in rebuttal testified that they had never noticed anything about the defendant that led them to believe that he was of unsound mind. There was, moreover, direct objective testimony concerning the defendant's actions, conversations and statements immediately prior to and on the day of the killings from which the jury could infer that he knew what he was doing when he killed the Giovannettis and knew that it was wrong, which, after all, is the test of legal insanity rather than whether the accused was mentally ill from a medical viewpoint.

The appellant charges error in the trial court's permitting the lay witnesses, called by the Commonwealth in rebuttal, to testify that they had never noticed anything about the defendant that would indicate that he was of unsound mind without first stating facts observed by them which would justify their opinion. This testimony was clearly competent. Its admission in evidence was, therefore, not error. In *Commonwealth v. Wireback*, 190 Pa. 138, 145, 42 A. 542, a like complaint was made of the testimony of lay witnesses who knew the defendant and who were permitted to testify that they had not discovered anything in his conduct, manner and appearance that would lead them to believe he was of unsound mind. This court held the testimony to be competent and, in overruling a cognate assignment of error, said,—"The witnesses were not asked to give their opinion affirmatively, as to whether the defendant was of sound mind, for they had stated nothing to warrant such opinion; but whether they had noticed anything in his conduct or conversation irrational or indicating insanity at the times they saw and talked with him, was clearly competent." It is where a witness is offered to testify affirmatively that a person is of unsound mind that he must first give the reasons upon which he bases his opinion. The distinction was

well stated for this court by Mr. Justice (later Chief Justice) SCHAFFER in *Commonwealth v. Cavalier,* 284 Pa. 311, 319-320, 131 A. 229, where he said, —"We think possibly that much of the confusion in the cases may be ascribed to the failure to distinguish between different situations obtaining when witnesses are called to testify, on the one hand, that they have noticed nothing which leads them to believe that a person was of unsound mind, and, on the other, that in their opinion a person was insane. A lay witness, who has had contact with one whose mental state is the subject of inquiry, may testify, after stating his opportunities for observation but without first stating all the facts justifying his conclusion, that he has observed nothing in the conduct or speech of the individual which would lead to the opinion that he is not of normal mind: Com. v. Wireback, 190 Pa. 138, 145. It is one thing to have lay witnesses thus testify and quite a different situation to have them give an opinion, after the recital of facts coming under their observation, that a person was insane: Com. v. Marion, 232 Pa. 413, Com. v. Henderson, 242 Pa. 372." What the learned jurist thus clearly recognized was the distinct difference between supporting a legally established mental norm with testimony that nothing out of the ordinary was observed in the subject's conduct and attempting to overcome such norm by preponderating proof contra.

Nor was there any error in the trial court's charge wherein he instructed the jury that "All the testimony that you have heard here has been competent testimony with respect to this question [of insanity], and the layman is just as competent to testify as the expert." In *Commonwealth v. Cilione,* 293 Pa. 208, 142 A. 216 (1928), where the defense to a charge of murder was insanity, the late Chief Justice MAXEY, then a judge of the Court of Common Pleas of the 45th Judicial District, specially presided at the trial. He very directly

recognized the equal competency of lay witnesses with experts on the question of insanity when he charged the jury that "In that connection [defendant's mental condition] you will remember the testimony of the people who knew this man before the commission of the homicide charged. They are what we call lay witnesses. They do not claim to be experts on the mind. . . . They are called to rebut the testimony on behalf of the defendant that he is of unsound mind. . . . You do not have to be a psychiatrist to judge whether a man's actions are normal or abnormal. . . . the testimony of the laymen is to be considered as well as the testimony of the so-called experts." See Paper Books, 293 Pa. 208, Record 145 A. In *Commonwealth v. Gearhardt*, 205 Pa. 387, 391, 54 A. 1029, the "intelligent layman" was recognized as being no less capable than an expert of defining the distinction between legally cognizable mental conditions. Possible error in the portion of the charge in the instant case, as above quoted, could hardly have suggested itself to appellant's counsel at trial. Neither specific exception thereto was taken nor were other or amended instructions requested: see *Commonwealth v. Bruno*, 316 Pa. 394, 402, 175 A. 518.

Among the points for charge which the appellant submitted was the following,—"11. The knowledge and experience of medical experts is of great value in questions of insanity. Evidence has been given of the observation and experience of a medical expert sufficient to enable him to form an intelligent opinion and he has testified to that opinion. While the jury are not bound to adopt the conclusion of an expert, yet they must give careful consideration to the testimony of an expert who has made the diseases of the human mind a special study." The learned trial judge affirmed the point, at the same time enlarging the scope of the instruction's applicability as follows,—"The Court: And

we say that that is so. We go a step further. You must give the same careful consideration to the testimony of every witness in the case." Here, again, the appellant neither excepted to the court's answer to the request nor asked for a restricted answer limiting the instructions of the expert's testimony. However, the appellant now complains that the court's answer to the request ". . . was in effect putting on a par with the testimony of the mental expert, Dr. Spear, the testimony of all of the sixteen lay witnesses." There was no error in that: see quotation from Judge MAXEY'S charge to the jury in *Commonwealth v. Cilione,* supra; also *Commonwealth v. Gearhardt,* supra.

The defendant's written confessions (Commonwealth's Exhibits 10 and 12) were properly admitted in evidence. Having been voluntarily given by the defendant, they were clearly admissible. "Where, by the Commonwealth's witnesses, it is shown that a confession is made voluntarily, without such threat or inducement as might secure a false confession, it must be admitted": *Commonwealth v. Spardute,* 278 Pa. 37, 48, 122 A. 161, quoted with approval in *Commonwealth v. Lockard,* 325 Pa. 56, 62, 188 A. 755. It is for the jury to determine what weight should be given to a confession. Ordinarily, a voluntary confession is entitled to great weight: *Commonwealth v. Wilson,* 186 Pa. 1, 22, 40 A. 283. The mere fact that the defendant was in custody and in the charge of police officers when he gave the confessions did not make them any less voluntary: *Commonwealth v. Spardute,* supra, 47. "It is the manner and circumstances under which a confession is procured, not the person to whom it is made, that determines its admissibility": *Commonwealth v. Eagan,* 190 Pa. 10, 21, 42 A. 374. What the appellant actually attacks in respect of the confessions is not their integrity but rather the weight to be given to them

which, of course, was a matter for the jury to decide. The objection that the confessions were taken from the defendant in narrative rather than in question-and-answer form is without pertinency so far as their admissibility is concerned.

A witness for the defense was asked in direct examination,—"Did you see any change in his [the defendant's] disposition?" The appellant asserts that the trial judge erred in sustaining the Commonwealth's objection to the question on the ground that it was leading. *Commonwealth v. Zoltowski,* 246 Pa. 410, 419, 92 A. 496, supports the ruling. In no event, was the defendant harmed; his counsel rephrased the question and elicited the testimony sought.

The two remaining questions raised by the appellant go to the same matter. When Dr. Spear was being cross-examined with respect to the memory displayed by the defendant on the day of the killings and the succeeding day, as indicated by the similar factual accounts contained in the two confessions, he stated that the defendant "would have signed anything that was presented to him. . . . If they told him to sign it he would have done it." By further answer, the doctor implied that the defendant signed the confessions at the direction of the police without having known what was in them. At that point the trial judge interposed to observe that "That has very serious implication, that possibly the policeman would suggest to a man the answers to questions. Do you mean to convey that to this jury?" Without answering categorically, Dr. Spear said, "I mean to say this: That this experience, from definitely honest policemen, and I assume that to be correct. Having the facts of the case, as all those who were in contact—" The doctor's answer was so obviously meaningless that the trial judge broke in, saying,—"Wait a minute. They asked him where he got

the gun. He told them where he got it. How did they know where he received that gun?" The doctor answered, "I don't know, Sir." The appellant urges that the court's interrogation of Dr. Spear, as to whether he intended the serious implication of his answers, prejudiced the witness, and consequently the defendant, with the jury and that, likewise, the court's inquiry of the doctor as to how the police would know where the defendant had obtained the gun if he hadn't told them had the effect of suggesting doubt on the part of the trial judge with respect to the witness' veracity. If such were the effect of the court's interpolations, it was no more than the witness himself had invited. The learned trial judge did not abuse his discretion. In *Commonwealth v. Myma,* 278 Pa. 505, 507, 123 A. 486, where the appellant in a capital case contended that "the trial judge unduly questioned . . . a number of witnesses to his prejudice", this court said that "A judge in a jury trial has a right to interrogate witnesses. It sometimes becomes his duty to do so, even to the point of recalling a witness to supply an omission of proof on a material point [citing cases]." Moreover, no objection was made or exception taken by the defendant to the trial judge's questioning of the witness. "If no exception is taken at the time the questions are asked a witness by the trial judge, such questions are not the subject of review": *Commonwealth v. Del Giorno,* 303 Pa. 509, 515, 154 A. 786 (also a capital case).

We have carefully read the entire record and have reviewed both the law and the evidence in the case and find that the ingredients necessary to constitute murder in the first degree are present. There is no merit in any of the appellant's contentions all of which we have hereinabove discussed and considered. The case was ably tried with marked fairness to the defend-

ant and was submitted to the jury in a charge that was clear, thorough and impartial.

With respect to the penalty fixed by the jury, we have nothing to do. Our duty is limited to reviewing for possible trial error and to determining independently from our reading of the record whether the ingredients of murder in the first degree have been proven to exist: Act of February 15, 1870, P. L. 15, Sec. 2, 19 PS §1187. Any interference by us with the penalty fixed by the verdicts would be an unwarranted invasion of the jury's province. Since the passage of the Act of May 14, 1925, P. L. 759, which conferred upon the jury the power to fix the penalty between death and life imprisonment upon a conviction of murder in the first degree, this court has never presumed to change the penalty as fixed by the jury's verdict upon a competent finding of the defendant's guilt of murder in the first degree: see *Commonwealth v. Taranow,* 359 Pa. 342, 344, 59 A. 2d 53.

The judgments and sentences are affirmed.

---

DISSENTING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

In my opinion the defendant was improperly convicted of murder in the first degree with penalty fixed at death. The killings were proven and in fact were conceded. The defense was insanity. *If defendant were sane,* there cannot be the slightest doubt but that he was guilty of wilful, deliberate and premeditated murder, which fully justified the imposition of a sentence of death. I would, however, grant a new trial (a) because the verdict was against the *weight* of the evidence (b) because there was trial error in admitting in evidence unnecessary photographs which were of an extremely gruesome and prejudicial nature—even though

counsel for defendant consented to their admission, and *where there was no explanation to the jury by the trial judge concerning the reason for such admission.*

Under the Act of February 15, 1870 P. L. 15 sec. 2, 19 PS 1187, an appellate court is required to review the law and evidence and determine whether the ingredients necessary to constitute murder in the first degree were proven to exist. Furthermore, in a *homicide case,* especially where a defendant's life is at stake, and where defendant may have been deprived of a fair and impartial trial or suffered manifest injustice an appellate court will review the case notwithstanding the failure. of defendant's counsel to take proper exceptions: *Commonwealth v. Stowers,* 363 Pa. 435, 70 A. 2d 226, and cases therein cited.

Defendant, Guerino Carluccetti, on April 2, 1935, killed Emilio Giovannetti and Laura Giovannetti, his wife. The revolting details of the killings need not again be recited. The victim husband was killed by gun shot wounds inflicted by defendant. The wife was killed by defendant beating her over the head with a gun stock. The brutal and unjustifiable killings, in all their revolting circumstances, obviously indicated or suggested the possible insanity of defendant. A lunacy commission was appointed on May 24, 1935, and a hearing had on June 24, 1935, following which defendant was committed to the Farview State Hospital for the criminal insane. Defendant was therein incarcerated for fourteen years, until May 20, 1949, when he was returned to Dauphin County for trial. Defendant was tried commencing September 19, 1949. On September 23, 1949, a verdict was rendered by the jury of guilty of murder in the first degree with penalty fixed at death, upon which sentence was pronounced.

The sole defense was insanity *at the date of the killings,* viz.: April 2, 1935. After testimony concern-

ing the facts of the killings, about which there is no dispute, the Commonwealth rested. Defendant produced Dr. Irving J. Spear, a psychiatrist and neurologist, who had testified before the lunacy commission on June 24, 1935. The doctor gave positive, *affirmative* testimony concerning the insanity of defendant and testified that, in his opinion, defendant was insane on the date of the killings on April 2, 1935. *The Commonwealth conceded* (p. 403) *that the doctor was qualified to render such opinion.* After reciting his professional qualifications and accomplishments, the witness testified in great detail that defendant was suffering from *dementia praecox,* with paranoiac tendency; that the psychosis was schizophrenia (split personality, i.e., Dr. Jekyll and Mr. Hyde) ; and that *on April 2, 1395,* defendant was mentally sick and did not know the difference between right and wrong.

With the record as above, defendant rested. The Commonwealth then, *in rebuttal,* called sixteen *lay* witnesses, all of whom testified *negatively* that during the period of time they knew defendant *they had never noticed anything about him that would indicate to them that defendant was of unsound mind.* Such evidence is *admissible* under *Commonwealth v. Wireback,* 190 Pa. 138, 42 A. 542 and *Commonwealth v. Cavalier,* 284 Pa. 311, 131 A. 229. Cf. Wigmore on Evidence 3rd ed., Vol. VII, sec. 1938, pp. 45, 46. It, nevertheless, is of *negative* character. Furthermore *quantity,* in law, never takes the place of *quality.* The *weight* of defendant's sole professional witness—with his ample *positive* testimony—greatly exceeds that of the *negative* testimony of the Commonwealth's numerous witnesses called *in rebuttal.* The *uncontradicted* medical testimony of the expert was that defendant suffered from schizophrenia, or split personality; that therefore members of defendant's family, relatives, acquaintances,

etc., would ordinarily be unable to detect any evidence of insanity. It follows that the negative *lay opinion testimony* would have but little probative value on the question of defendant's sanity or insanity.

The assistant district attorney vigorously and exhaustively cross-examined the doctor. He cross-examined concerning the doctor's knowledge of the personnel of the staff at the Farview Hospital. The necessary inference was a criticism of the doctor's failure to make inquiry and secure records at the hospital. It seems curious that while the Commonwealth called sixteen *lay* witnesses *to rebut* the expert scientific testimony of an admittedly qualified physician, *it* failed to secure from the hospital the authenticated records of that institution, buttressed by *professional* opinions of qualified staff physicians or other medical experts, concerning the mental condition of a patient (at the time of the killings and thereafter) who had been committed to that institution in 1935 and who had remained as a patient in such state institution for the criminal insane for a period of fourteen years.

It is axiomatic that a verdict not warranted by the evidence will be set aside. Whether the evidence is insufficient to support the verdict is a question of law for the court. A verdict contrary to the *weight of the evidence* or *shocking to judicial conscience* is likewise a question of law: see host of cases cited in Vol. 6, sections 77 and 78, in Standard Pennsylvania Practice p. 317 et seq.

I regard as trial error the admission of the Commonwealth's evidence of the gruesome photographs of the bodies of the dead victims, exhibits X7-8-9. Number 7 is the photograph of the semi-nude body of the male victim. Numbers 8 and 9 are photographs of the semi-nude body of the female victim, in a bath tub, revealing that her skull had been bashed in, and showing

bloody matter splattered upon the body, tub and walls. These photographs were unnecessary and were clearly prejudicial to defendant. True, defendant's counsel consented to such admission. But where the life of a defendant is at stake because of inadvertence, carelessness or ignorance of counsel, this Court will intervene to prevent an injustice. The late Chief Justice MAXEY (while an Associate Justice of this Court) said in *Commonwealth v. Corrie,* 302 Pa. 431, 153 A. 743, p. 436: "Should a case arise where a defendant was being hurried to an undeserved doom by reason of the carelessness of his counsel in not taking exceptions to palpable errors which offend against the fundamentals of a fair and impartial trial, the appellate courts would, without being recusant to this salutary rule, find a way to avert the injustice threatened. Some invasions of rights amount to a deprivation of that due process of law guaranteed by the federal Constitution and, in different phraseology, by the state Constitution, . . . ."

In *Commonwealth v. Scott,* 284 Pa. 159, 130 A. 317, we said p. 162: "No exception was taken to the charge or request that it be reduced to writing and filed of record, hence it is not properly before us for review. Impelled, however, by the gravity of the defendant's situation, we have carefully examined the charge. . . ." See also *Commonwealth v. Stowers,* 363 Pa. 435, 70 A. 2d 226.

The admission in evidence, in a homicide case, of photographs of the dead victim ordinarily is a matter of discretion of the trial judge. But judicial discretion must be exercised within proper limits. Such evidence, to be admissible, must be helpful to the jury in their investigation and deliberation. The photographs must not be introduced solely to arouse the jury's emotions. Futhermore, *the reason for the admission must be carefully explained to the jury by the trial judge. In Com-*

*monwealth v. Gibbs,* 366 Pa. 182, 76 A. 2d 608, Mr. Chief Justice DREW said, p. 185: ". . . several photographs of the body were introduced in evidence over defendant's objections. It is his position that these exhibits were of no value as evidence and were introduced solely to inflame the jury. That question has been raised in numerous cases and the law in respect to inflammatory evidence has become well settled. So long as the evidence is helpful to the jury in their investigation and deliberation and not introduced solely to arouse their emotions, the trial judge may, in the exercise of his sound discretion, admit such exhibits but *the reason for their admission must be carefully explained to the jury*: (citing cases). In the instant case the photographs were introduced to show the position and condition of the body and the extent of the wounds. . . . All of the exhibits were used extensively by the medical experts to illustrate their oral testimony. These were all proper purposes: (citing cases). Therefore, the trial judge did not abuse his discretion in admitting these exhibits into evidence *subject to the precautionary instruction, which he gave, that the jurors were not to allow themselves to be prejudiced by them but were to consider them only for the purposes for which they were offered.*" (Italics supplied)

An examination of the evidence will disclose that there was not the slightest reason why the photographs were helpful to the jury in their investigation and deliberation. While perhaps unintentional, the effect on the jury clearly was to arouse their emotions to the prejudice of defendant. *But the fatal trial error was the failure of the trial judge to explain carefully to the jury the reason for the admission of the photographs.*

I am not at all impressed by the Commonwealth's apprehension expressed at argument that, in the event of the grant of a new trial and a subsequent acquittal

because of insanity at the time of the killings, a dangerous person might be turned loose in the community. Mr. Justice HORACE STERN, while President Judge of Philadelphia Court of Common Pleas No. 2, wrote an opinion in *Commonwealth v. Ritter*, 13 D. & C. 285, which has been widely cited in this and other states. He demonstrated that the necessity for appropriate punishment in criminal cases is chiefly in the interest of the protection of society. The Legislature probably had this in mind when, under the Act of March 31, 1860, P. L. 427 sec. 66, as amended by the Act of April 17, 1929, P. L. 532 sec. 2, 19 PS 1351, it was enacted that where it is found that a person was insane at the time of the commission of the crime, and is acquitted because of such insanity, the court is empowered to order the defendant to be kept in strict custody so long as he shall continue to be of unsound mind. In *Commonwealth v. Winter*, 289 Pa. 284, 137 A. 261, this Court said, p. 296: "The only effect of the special finding of acquittal on the ground of insanity would be to authorize the court to order the defendant into custody while he continued of unsound mind. . . ."

For the foregoing reasons I would reverse the judgments and award a new trial.